FILED

1 | Donald R. Warren, C.B. No. 138933
Phillip E. Benson, C.B. No. 97420
2 | Warren ▪ Benson Law Group
7825 Fay Ave., Suite 200
3 | La Jolla, CA 92037
Telephone: (858) 456-1900
4 | Facsimile: (858) 454-5878

2013 JUN 14  AM 10: 29

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

5

6 | Attorneys for *Qui Tam* Plaintiff

7

8 | **UNITED STATES DISTRICT COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10 | **WESTERN DIVISION**

11 | UNITED STATES OF AMERICA ) CASE NO. **CV 13 - 04273 - RGK**
12 | AND STATE OF CALIFORNIA, ex ) (MRWx)
rel John Doe, )
13 | )
Plaintiffs, ) COMPLAINT FOR VIOLATION OF
14 | ) THE FEDERAL AND CALIFORNIA
) FALSE CLAIMS ACTS
15 | v. )
) [31 U.S.C. § 3729 *et seq.* and Cal. Gov.
16 | PAMC, LTD.; SHIN-YIN WONG, ) Code § 12650 *et seq.*]
M.D.; GEORGE MA, M.D.; TIT )
17 | LI, M.D.; CARL MOY, M.D.; ) **JURY TRIAL DEMANDED**
THICK GONG CHOW, M.D. and )
18 | STEPHEN KWAN, M.D. )
) **LODGED UNDER SEAL PURSUANT**
19 | Defendants ) **TO 31 U.S.C. §§ 3730(b)(2) and (3)]**
)
20

21

22 | *Qui Tam* Plaintiff Paul Chan suing for himself (as John Doe), and for the United

23 | States and the State of California, alleges as follows:

24 | **I. NATURE OF ACTION**

25

26 | 1.    Paul Chan ("Chan"), on behalf of the United States and the State of

27 | California, brings this action to recover treble damages and civil penalties from false

28 |

claims submitted to the Medicare and Medicaid programs as a result of the conduct

of the defendants, PAMC, Ltd. (aka Pacific Alliance Medical Center); Shin-Yin

Wong, M.D.; George Ma, M.D.; Tit Li, M.D.; Carl Moy, M.D.; Thick Gong Chow,

M.D. and Stephen Kwan, M.D.. Beginning before 2006, and continuing, PAMC,

Ltd., contolled and directed by Drs.Wong, Ma, Li, Moy, Chow and Kwan

(collectively "Defendants") entered into various payment agreements with

physicians, clinics and medical corporations that were large volume referrers of

patients for admission to Pacific Alliance Medical Center.  These payment

agreements included sublease contracts and marketing assistance contracts that

greatly exceeded fair market value and were specifically contingent upon the volume

of referring providers' admissions to Pacific Alliance Medical Center hospital, all of

which amounted to illegal kickbacks and were in violation of federal and California

law. By knowingly submitting claims for reimbursement based on referrals

generated by physicians and clinics who received compensation based on these

terms, Defendants violated the False Claims Act ("FCA"), 31 U.S.C. § 3729, et

seq., the California False Claims Act ("CA FCA"), Cal. Gov. Code § 12650 *et seq.*

the Stark Act and the federal Anti-Kickback Statute.

       2.      Within these time frames, and continuing, Defendants knowingly

submitted, and caused the submission of, thousands of false claims to the United

States and California for reimbursement which resulted in millions of dollars of

reimbursement that would not have been paid but for Defendants' misconduct

## II. JURISDICTION AND VENUE

3.     The Court has subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345.  The Court may exercise personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a).

4.     Venue is proper in the Central District of California under 31 U.S.C. § 3732 and 28 U.S.C. §§ 1391(b) and (c) because the defendants reside in this District and because the defendants committed acts within this district that violated 31 U.S.C. § 3729.

## III. PARTIES

5.     *Qui Tam* Plaintiff Paul Chan ("Chan") is a resident of the United States, currently residing in the Central District of California.  In April 2013, Mr. Chan became employed as a Senior Manager of Physician Integration for Pacific Alliance Medical Center and, as of the filing of this Complaint, continues in that employment.

6.     Defendant PAMC, Ltd. is a California limited partnership, with headquarters located in Los Angeles, California.  Among its other businesses, PAMC, Ltd. owns and operates Pacific Alliance Medical Center, which is an acute care hospital in Los Angeles.  PAMC, Ltd and Pacifi Alliance Medical Center are collectively referred to herein as "PAMC."  PAMC is owned and controlled by

3

Defendants Dr. Shin-Yin Wong; Dr. George Ma; Dr. Tit Li; Dr. Carl Moy; Dr. Thick Gong Chow and Dr. Stephen Kwan.

7.     Defendant  Shin-Yin Wong, M.D.; George Ma, M.D.; Tit Li, M.D.; Carl Moy, M.D.; Thick Gong Chow, M.D. and Stephen Kwan, M.D., M.D. ("Wong") is a partner in PAMC, Ltd. who, along with the other individual PAMC, Ltd. partnership defendants, owns and controls PAMC, Ltd. and Pacific Alliance Medical Center.  At all relevant times, Wong directed the participation of PAMC in the fraud schemes alleged herein.  Wong resides in the Central District of California.

8.     Defendant Shin-Yin Wong, M.D. ("Wong") is a partner in PAMC, Ltd. who, along with the other individual PAMC, Ltd. partnership defendants, owns and controls PAMC, Ltd. and Pacific Alliance Medical Center.  At all relevant times, Wong directed the participation of PAMC in the fraud schemes alleged herein. Wong resides in the Central District of California.

9.     Defendant George Ma, M.D. ("Ma") is a partner in PAMC, Ltd. who, along with the other individual PAMC, Ltd. partnership defendants, owns and controls PAMC, Ltd. and Pacific Alliance Medical Center.  At all relevant times, Ma directed the participation of PAMC in the fraud schemes alleged herein.  Ma resides in the Central District of California.

10.     Defendant Tit Li, M.D. ("Li") is a partner in PAMC, Ltd. who, along with the other individual PAMC, Ltd. partnership defendants, owns and controls

PAMC, Ltd. and Pacific Alliance Medical Center.  At all relevant times, Li directed the participation of PAMC in the fraud schemes alleged herein.  Li resides in the Central District of California.

11.     Defendant Carl Moy, M.D. ("Moy") is a partner in PAMC, Ltd. who, along with the other individual PAMC, Ltd. partnership defendants, owns and controls PAMC, Ltd. and Pacific Alliance Medical Center.  At all relevant times, Moy directed the participation of PAMC in the fraud schemes alleged herein.  Moy resides in the Central District of California.

12.     Defendant Thick Gong Chow, M.D. ("Chow") is a partner in PAMC, Ltd. who, along with the other individual PAMC, Ltd. partnership defendants, owns and controls PAMC, Ltd. and Pacific Alliance Medical Center.  At all relevant times, Chow directed the participation of PAMC in the fraud schemes alleged herein.  Chow resides in the Central District of California.

13.     Defendant Stephen Kwan, M.D. ("Kwan") is a partner in PAMC, Ltd. who, along with the other individual PAMC, Ltd. partnership defendants, owns and controls PAMC, Ltd. and Pacific Alliance Medical Center.  At all relevant times, Kwan directed the participation of PAMC in the fraud schemes alleged herein.  Kwan resides in the Central District of California.

14.     Plaintiff is informed and believes, and thereon alleges, that Defendants, and each and all of them, at all relevant times hereinafter mentioned were the agents,

partners, fiduciaries, representatives, and/or co-conspirators of each of the remaining defendants. Defendants, in doing the things hereinafter alleged, were acting within the course and scope of such relationship and were responsible for the occurrences herein alleged.

## IV. The False Claims Act

15. The FCA provides, in pertinent part, that a person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(a)(1)C conspires to commit a violation of subparagraph (A), (B),...or (G);

(a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains. . . .

31 U.S.C. § 3729[1]   For purposes of the False Claims Act,

---

[1]The FCA was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009. Given the nature of the claims at issue, Sections 3279(a)(1) and 3279(a)(7) of the prior statute, and Section 3729(a)(1)(A) and 3729(a)(1)(G) of the revised statute are all applicable here. Sections 3729(a)(1) and 3729(a)(7) apply to conduct that occurred before FERA was enacted, and sections 3729(a)(1)(A) and

the term "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and require no proof of specific intent to defraud.

31 U.S.C. § 3729(b).

## V. **The California False Claims Act**

16.     The California False Claims Act provides, in pertinent part:

(a) Any person who commits any of the following enumerated acts in this subdivision shall have violated this article and shall be liable to the state or to the political subdivision for three times the amount of damages that the state or political subdivision sustains because of the act of that person. A person who commits any of the following enumerated acts shall also be liable to the state or to the political subdivision for the costs of a civil action brought to recover any of those penalties or damages, and shall be liable to the state or political subdivision for a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars $10,000) for each violation:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) Conspires to commit a violation of this subdivision

(7)  knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or

---

3729(a)(1)(G) apply to conduct after FERA was enacted. Section 3729(a)(1)(B) is applicable to all claims in this case by virtue of Section 4(f) of FERA, which makes the new changes to that provision applicable to all claims for payment pending on or after June 7, 2008.

transmit money or property to the state or any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or any political subdivision,

Cal. Govt. Code § 12651(a)(1-3, 7).

For purposes of the California False Claims Act,

the term "knowing" and "knowingly" mean that a person, with respect to information (A) has actual knowledge of the information; (B) acts in deliberate ignorance of the truth or falsity of the information; or (C) acts in reckless disregard of the truth or falsity of the information. Proof of specific intent to defraud is not required.

Cal. Govt. Code § 12650(b)(A - C).

## VI. **The Medicare Program**

17.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of healthcare services for certain individuals. HHS is responsible for the administration and supervision of the Medicare program, which it does through CMS, an agency of HHS.

18.     Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. See 42 U.S.C. §§ 1395c-1395i-4. Part B primarily covers physician and other ancillary services. See 42 U.S.C. § 1395k.

19.     To assist in the administration of Medicare Part A, CMS contracted

with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries, typically insurance companies, were responsible for processing and paying claims and cost reports.

20.     To assist in the administration of Medicare Part B, CMS contracted with "carriers." Carriers, typically insurance companies, were responsible for processing and paying Part B claims.

21.     Beginning in November 2006, Medicare Administrative Contractors ("MACs") began replacing both the carriers and fiscal intermediaries. See Fed. Reg. 67960, 68181 (Nov. 2006). The MACs generally act on behalf of CMS to process and pay Part A and Part B claims and perform administrative functions on a regional level. See 42 § C.F.R. 421.5(b).

22.     Providers who wish to be eligible to participate in Medicare Part A must periodically sign an application to participate in the program. The application, which must be signed by an authorized representative of the provider, contains a certification statement that states "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of

9

participation in Medicare."

23.     Under the Medicare program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient and outpatient services.

24.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits Medicare Part A claims for interim reimbursement for inpatient and outpatient items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64.  Hospitals submit patient-specific claims for interim payments on a Form UB-92 or UB-04.

25.     As detailed below, PAMC and the PAMC partnership defendants submitted or caused to be submitted claims both for specific inpatient and outpatient services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare and Medicaid beneficiaries.

26.     As a prerequisite to payment under Medicare Part A, CMS requires hospitals to submit annually a form CMS-2552, more commonly known as the hospital cost report. Cost reports are the final claim that a provider submits to the fiscal intermediary or MAC for items and services rendered to Medicare beneficiaries.

27.     After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary or MAC, stating the amount of Part A reimbursement the provider believes it is due for the year. See 42 U.S.C. §

1395g(a); 42 C.F.R. § 413.20. See also 42 C.F.R. § 405.1801(b)(1). Medicare relies

upon the hospital cost report to determine whether the provider is entitled to more

reimbursement than already received through interim payments, or whether the

provider has been overpaid and must reimburse Medicare. See 42 C.F.R.

§§ 405.1803, 413.60 and 413.64(f)(1).

28.     PAMC was, at all times relevant to this complaint, required to submit

annually a hospital cost report to the MAC for California.

29.     During the relevant time period, Medicare Part A payments for hospital

services were determined by the claims submitted by the provider for particular

patient discharges (specifically listed on UB-92s and UB-04s) during the course of

the fiscal year. On the hospital cost report, this Medicare liability for services is then

totaled with any other Medicare Part A liabilities to the provider. This total

determines Medicare's true liability for services rendered to Medicare Part A

beneficiaries during the course of a fiscal year. From this sum, the payments made

to the provider during the year are subtracted to determine the amount due the

Medicare Part A program or the amount due the provider.

30.     Under the rules applicable at all times relevant to this complaint,

Medicare, through its fiscal intermediaries and MACs, had the right to audit the

hospital cost reports and financial representations made by PAMC to ensure their

accuracy and preserve the integrity of the Medicare Trust Funds. This right includes

the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made. See 42 C.F.R. § 413.64(f).

31.     Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

32.     For all relevant years, the responsible provider official was required to certify, and did certify, in pertinent part:

> to the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.  I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

33.     For the entire period at issue, the hospital cost report certification page also included the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

34.     Thus, the provider was required to certify that the filed hospital cost report is (1) truthful, i.e., that the cost information contained in the report is true and

accurate; (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, i.e., that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations, including the Stark Statute (described below).

35.     For each of the years at issue, PAMC submitted cost reports to Its MAC attesting, among other things, to the certification quoted above.

36.     A hospital is required to disclose all known errors and omissions in its claims for Medicare Part A reimbursement (including its cost reports) to its fiscal intermediary or MAC.

37.     In addition to Part A claims, doctors or other providers submit Medicare Part B claims to the carrier or MAC for payment.

38.     Under Part B, Medicare will generally pay 80 percent of the "reasonable" charge for medically necessary items and services provided to beneficiaries. *See* 42 U.S.C. §§ 1395l (a)(1), 1395y(a)(1). For most services, the reasonable charge has been defined as the lowest of (a) the actual billed charge, (b) the provider's customary charge, or (c) the prevailing charge for the service in the locality. *See* 42 C.F.R. §§ 405.502-504.

39.     Not surprisingly, in order to prevent waste, fraud and abuse, the Social Security Act, 42 U.S.C. § 1395y(a)(1) states the Medicare Program is only

authorized to pay for items and services that are medically "reasonable and necessary." The Secretary of HHS is authorized to define what services meet that criteria. 42 U.S.C. § 1395ff(a). Medicaid and other federally funded programs also only pay for items and services that are medically "reasonable and necessary."

40.     Medicare providers have a legal duty to familiarize themselves with Medicare's reimbursement rules, including those stated in the Medicare Manuals. *Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 64-65 (1984). A provider's failure to inform itself of the legal requirements for participation in the program acts in reckless disregard or deliberate ignorance of those requirements, either of which is sufficient to charge it with knowledge of the falsity of the claims or certifications in question, under the False Claims Act. *United States v. Mackby,* 261 F.3d 821, 828 (9th Cir. 2001).

## VII. THE MEDICAID PROGRAM

41.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

42.     As a result of its involvement in the Medicaid program, the State of California also provides half of the funds used to provide medical treatment through its Medi-Cal program.

14

43.    The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§ 1396 et seq.

44.    In order to qualify for FFP, each state's Medicaid program must meet certain minimum requirements, including the provision of hospital services to Medicaid beneficiaries.  42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

45.    In the State of California, provider hospitals participating in the Medicaid program submit claims for hospital services rendered to beneficiaries to the State for payment.

46.    In addition, the State requires hospitals participating in the Medicaid program to file a copy of their Medicare cost report with the State.

47.    The State of California uses Medicaid patient data and the Medicare cost report to determine the reimbursement to which the facility is entitled based in part on the number of Medicaid patients treated at the facility.

## VIII. THE STARK STATUTE

48.    Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Statute") prohibits a hospital (or other entity providing designated health services) from submitting Medicare claims for designated health services (as defined in 42 U.S.C. § 1395nn(h)(6)) based on patient referrals from physicians having a "financial relationship" (as defined in the statute)

with the hospital, and prohibits Medicare from paying any such claims.

49.     The Stark Statute establishes the clear rule that the United States will not pay for designated health services prescribed by physicians who have improper financial relationships with other providers. The statute was designed specifically to prevent losses that might be suffered by the Medicare program due to questionable utilization of designated health services.

50.     The Stark Statute explicitly states that Medicare may not pay for any designated health service provided in violation of the Stark Statute. See 42 U.S.C. § 1395nn(g)(1). In addition, the regulations implementing the Stark Statute expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353 (2006).

51.     Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider unless a statutory or regulatory exception applies. See Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

52.     In 1993, Congress passed Stark II, which extended the Stark Statute to referrals for ten additional designated health services. See Omnibus Reconciliation

Act of 1993, P.L. 10366, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

53.     The Stark Statute prohibits a hospital from submitting a claim to Medicare for "designated health services" that were referred to the hospital by a physician with whom the hospital has a "financial relationship," unless a statutory exception applies. "Designated health services" include inpatient and outpatient hospital services. See 42 U.S.C. § 1395nn(h)(6).

54.     In pertinent part, the Stark Statute provides:

(a) Prohibition of certain referrals
   (1)     In general
           Except as provided in subsection (b) of this section, if a physician . . . has a financial relationship with an entity specified in paragraph (2), then –
           (A)     the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
           (B)     the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

55.     Moreover, the Stark Statute provides that Medicare will not pay for designated health services billed by a hospital when the designated health services resulted from a prohibited referral under subsection (a). See 42 U.S.C. § 1395nn(g)(1).

56. "Financial relationship" includes a "compensation arrangement," which means any arrangement involving any remuneration paid directly or indirectly to a referring physician. *See* 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

57. The Stark Statute and companion regulations contain exceptions for certain compensation arrangements. These exceptions include, among others, "bona fide employment relationships," "personal services arrangements," "fair market value arrangements," and "indirect compensation relationships."

58. In order to qualify for the Stark Statute's exception for bona fide employment relationships, compensation arrangements must meet, inter alia, the following statutory requirements: (A) the amount of the remuneration is fair market value and not based on the value or volume of referrals, and (B) the remuneration would be commercially reasonable even in the absence of referrals from the physician to the hospital. See 42 U.S.C. §§ 1395nn(e)(2)(B) and (e)(2)(C)).

59. In order to qualify for the Stark Statute's exception for personal services arrangements, a compensation arrangement must meet, inter alia, the following statutory requirements: (A) the compensation does not exceed fair market value, and (B) is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties (unless it falls within a further "physician incentive plan" exception as described in the statute). See 42 U.S.C. § 1395nn(e)(3)(A)(v).

60.     A "physician incentive plan" under § 1395nn(e)(3) is defined very narrowly, and only applies to compensation arrangements that "may directly or indirectly have the effect of reducing or limiting services provided with respect to individuals enrolled with the entity." 42 U.S.C. § 1395nn(e)(3)(B)(ii).

61.     In order to qualify for the Stark Statute's exception for fair market value compensation, there must be an agreement in writing, the agreement must set forth all services to be furnished, all compensation must be set in advance and consistent with fair market value, the agreement must not take into consideration the volume or value of referrals or other business generated by the referring physician, and the agreement must not violate federal or state law. See 42 C.F.R. § 411.357(l).

62.     In order to qualify for the Stark Statute's exception for indirect compensation arrangements, defined as any instance where compensation flows from the entity providing designated health services through an intervening entity and then to the referral source (see 42 C.F.R. § 411.354(c)(2)), there must be a written agreement, the compensation must be consistent with fair market value, the compensation may not take into consideration the volume or value of referrals or other business generated by the referring physician, and the agreement cannot violate the Anti-Kickback Statute. See 42 C.F.R. § 411.357(p).

63.     The Stark Statute also applies to claims for payment under Medicaid, and federal funds may not be used to pay for designated health services through a

state Medicaid program. *See* 42 U.S.C. § 1396b(s).  The same applies to California

funds for Medicaid.

## IX. THE ANTI-KICKBACK STATUTE

64.     The federal health care Anti-Kickback Statute ("AKS"), 42 U.S.C. §

1320a-7b(b), arose out of Congressional concern that financial inducements can

influence health care decisions and result in goods and services being more

expensive, medically unnecessary, and harmful to patients.   To protect the integrity

of federal health care programs, Congress prohibited the payment of kickbacks in

any form, regardless of whether the kickback actually gives rise to overutilization or

unnecessary care.  The AKS also reaches kickbacks concealed as legitimate

transactions.  See Social Security Amendments of 1972, Pub. L. No. 92-603,

§§242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare and Medicaid Antifraud and

Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and

Program Protection Act of 1987, Pub. L. No. 100-93.

65.     The AKS prohibits, among other things, paying  kickbacks to induce

referrals for services paid under federal healthcare programs. The AKS arose out of

Congressional concern that payoffs to those who can influence healthcare decisions

corrupt professional healthcare decision-making and may result in federal funds

being diverted to pay for goods or services that are medically unnecessary, of poor

quality, or even harmful to a vulnerable patient population. The AKS prohibits

payment of kickbacks in order to protect the integrity of the Medicare program from these difficult to detect harms. First enacted in 1972, the AKS was strengthened in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions do not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

66.     Compliance with the AKS is a precondition to both participation as a health care provider in and payment under Medicaid, Medicare, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Program, and other federal health care programs.

67.     The AKS prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical items and services, including items and services provided under the Medicare program.  In pertinent part, the statute states:

> (b) Illegal remuneration

> * * *

> (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person-

> > (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which

payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2). Violation of the statute can also subject the perpetrator to exclusion from participation in federal health care programs and civil monetary penalties of up to $50,000 per violation and up to three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7); 42 U.S.C. § 1320a-7(a)(7).

68.　　The AKS not only prohibits outright bribes, but also prohibits any remuneration by a hospital to a physician that has, as one of its purposes, inducement of the physician to refer patients for admission to the hospital.

69.　　These provisions demonstrate Congress' commitment to the fundamental principle that federal health care programs will not tolerate the payment of kickbacks.  Thus, compliance with the Anti-Kickback Statute is a prerequisite to a provider's right to receive or retain reimbursement payments from Medicare, Medicaid and other federal health care programs.

70.　　Similarly, compliance with the federal Anti-Kickback Statute and comparable state anti-kickback statutes is a prerequisite to a provider's right to

receive or retain reimbursement payments from state-funded health care programs.

## X. <u>DEFENDANTS' MISCONDUCT</u>

71.     Beginning before 2006 and continuing, PAMC and the partnership defendants conspired in a scheme by which PAMC:

a.     entered into sublease and other payment arrangements with physicians in violation of the Stark Statute and the Anti-Kickback Statute, specifically by compensating referring and admitting physicians (who referred and admitted patients for designated health services) under contracts that exceeded fair market value, were not commercially reasonable, and took into account the volume or value of the referrals or other business generated between the physician and PAMC; and

b.     submitted and/or caused the submission of false and fraudulent claims for payment to Medicare and Medicaid, which included claims relating to inpatient and outpatient designated health services rendered to patients who were referred or admitted to the hospital by the physicians who had improper contracts with PAMC which violated the Stark Statute and Anti-Kickback Statute.

72.     PAMC targets potential high referring physicians and has at least three ways in which it induces these physicians to refer and/or admit patients to the

23

hospital in violation of the Stark Statute and the Anti-Kickback Statute.  PAMC's schemes include, but are not limited to, the following:

A.)  Disguising payments to physicians in the form of a "sublease" for hosting meetings with seniors (Road To Healthy Living "RTHL" scheme);

B.)  Disguising payments to physicians in the form of a "Shared Marketing Agreement" in which PAMC pays thousands of dollars each month to market the physicians' practices to potential patients; and

C.)  Disguising payments to physicians in the form of a "MSBS" (Mama Saludable, Bebe Saludable: Healthy Mom, Healthy Baby) program targeting pregnant women who the physicians are required to refer to the PAMC obstetrics physicians for the delivery of their babies.

73.    In exchange for the compensation set forth in these arrangements, each referring physician agrees to refer or admit a target number of patients to Pacific Alliance Medical Center each month.

74.    In order to keep a tight control over the consideration paid to referring/admitting physicians, at least one of the PAMC partnership defendants specifically approves each of these compensation contracts before PAMC pays money to the referring/admitting physicians.

75.    A. **Road To Healthy Living ("RTHL") Scheme**.   Defendant PAMC tells each high-admitting physician that it will sublease a small space in the

physician's office for an approximately one hour "outreach" presentation to the physician's senior citizen patients each month.  This program addresses subjects like healthy living practices, high blood pressure, etc.  On average, only approximately 10 or so patients attend each RTHL presentation in the physician's office each month.

76.    The "sublease" is conditioned upon the doctor admitting as many patients as possible per month into the hospital, and the payments by PAMC are based on the volume of patient admissions by each physician.  Depending on the physician's practice, the required admissions can be as low as a guaranteed five patients per month, or up to fifteen patients or more per month.  The "market rate" of the "sublease" varies with the number of patients guaranteed to be admitted by the physician.   Further, the math for the sublease is grossly inflated.  As a representative example of how the compensation is calculated, a physician who has total office space of 4,000 sq.ft. (of which 1,000 sq ft - 1/4th - is the waiting room), would be paid 1/4th of the entire monthly rent by PAMC for using the waiting room only 1 hour per month.  If the physician's rent is $8,000 per month, the sublease would be $2,000 each month. This is for approximately one hour's use each month.

77.    PAMC diligently tracks the admissions for each of these physicians, complete with patient names and dates of birth, and threatens to cancel the "sublease" if the physician's admissions fall below target.  If the physician's

admissions continue to be below "target", PAMC cancels the "sublease."

78. Additionally, PAMC has at least two physicians in this "sublease" program who have never hosted any RTHL outreach meeting. Yet, these physicians still receive a check every month in exchange for admitting at least 10 patients to the hospital.

79. B. **Shared Marketing Agreement ("SMA") Scheme**. Another way in which PAMC pays doctors for hospital admissions is to join with physicians to hire a marketing firm to bring patients to the physician office. These marketers do things like hang around outside the Social Security office or WIC Nutrition stores and pass out flyers to recruit patients to the physician. They will also provide transportation to bring in patients to the physician's office. The SMA will also pay for door hangers, radio ads and TV ads for the physician. PAMC's monthly payments to marketers range from approximately $4,000 - $20,000 and more for each referring physician entity or clinic. The referring physician entities also put up a matching $4,000 - $20,000 per month to pay the marketer. Of course, this marketing payment by PAMC is expressly conditioned upon the physician entity or clinic referring many patient admissions to the hospital each month, and the payment amount is based upon on the volume of patient referrals/admissions by each physician.

80. PAMC diligently tracks the admissions for each of these physicians,

complete with patient names and dates of birth, and threatens to cancel the "shared marketing program" if the physician's admissions fall below target.  If the physician's admissions continue to be below "target", PAMC cancels the "shared marketing program."

81.   C. **Mama Saludable, Bebe Saludable: Healthy Mom, Healthy Baby("MSBS") Scheme**.  Obstetrics/delivery. A third way PAMC violates the Stark Statute and Anti-Kickback Statute is by compensating clinics and physicians to refer pregnant patients to PAMC obstetrics physicians for the delivery of their babies.  Many of these women are on Medicaid. This program is called the MSBS (Mama Saludable, Bebe Saludable: Healthy Mom, Healthy Baby) program and is very similar to the sublease for the "senior outreach" program in part A, above, or might also include a Shared Marketing Agreement as in part B. above, and the payment amount is based upon on the volume of patient referrals/admissions by each physician.  With the MSBS program, PAMC community relation representatives will set up a monthly baby shower at the doctor's office.  Each baby shower typically takes about two hours.

82.   PAMC diligently tracks the referrals for each of these referring clinics and physicians, complete with patient names and dates of birth, and threatens to cancel the "MSBS" program payments if the physician's or clinic's referrals and resulting admissions fall below target.  If the physician's or clinic's referrals and

admissions continue to be below "target", PAMC cancels the "MSBS" program.

83. **Dispraportionate Share Hospital**. PAMC is a DSH (Disproportionate Share Hospital) and receives additional government funding because it serves low income patients.

84. **Microsoft Access notes documenting these violations**. PAMC "Physician Integration" representatives are required to log notes of their communications with their referring physician accounts into PAMC's Microsoft Access database system. Excerpt examples of these notes, reflecting the fact that the grossly excessive "sublease" and other payments are contingent upon the volume of referring providers' admissions to Pacific Alliance Medical Center hospital include:

A. **Gioconda Rodriguez (Director of Physician Integration) Access call notes**.

Complete Care
6/28/2010 "Met with Martha, mkt vendor and Yuri. Contract signed and submitted to RZ. They have 13 dels/mo. Goals established. All is good."

Clinica Del Socorro
11/5/2010 "Per Roxanne at the clinic, they have referred about 4 or 5 pts… I told her to give me the names so I can start tracking. Dr. Wang will be their hospitalist… I told them we need a couple pts a week (med surge). They are also interested in building their OB but that will be long term… they still need to get CPSP and other things organized. However, I told them to send Med Surge and once we have a track record, then we can tailor a program for the Senior business. Will drop by next week to deliver flyers and physician order forms."

11/10/2010 "Dropped off physician order forms, transportation flyers and goodies to them. Introduced them to Wang (conference call) and met their PA, Jesse. They will refer as many pts as possible… I gave them their target 5+ per month, consistently. Will monitor over the next 2-3 months."

12/3/2010 "One admission so far this month; the deal is they will refer to Wang, when they reach at least 5 admits per month we will tailor RTHL program for clinic."


Dr. Samonte
1/11/2011 "Met with MD and Karen and BEF. Great meeting. We will move forward with marketing contract with Karen as well as Longwood assignments for now. He is putting on hold the lease with Dr. Chu. He admitted one pt this week and received one from GeriCare. Goal is 10 per month with room to grow to 15."
12/3/2010 "Met with Samonte and Karen, have to work on ambulance referrals, refer admits to Samonte; he said he can admit at least 15 admit per month."

Dr. Pickett
1/13/2011 "Met with MD… He is open to the sublease contract with our own Ed classes through Ana E. We spoke re the targeted goal… he believe 10 per month to start is achievable. He was very complimentary about PAMC; said the facility if very nice."

9/16/2010 "Met with Pickett… discussed SMA… he proposed a diff type of marketing. He can commit to 10-15 per month, as we align more than we are shooting for 20… he understands about our goals and I explained our planning strategies for next year and that we want to include him and work with him. He mentioned Care1st contract… that he will be assigned new OB pts from them… potentially 20-30 deliveries from those assignments."

Dr. Yan
11/11/2010 "GR stopped by to drop off phys order forms, transportation and important numbers for the hospital. Briefly inserviced his staff. Met with Freddie and told him black and white that we need to double our efforts since we are doubling resources. He knows Filart was only sending us about 15 pts… so I told him we need 30… I think we will see for sure 25 pts per month. The rest of the month we may see a peek since Filart will be out of

town and Yan will be handling everything. Freddie said they will send everything to us. Freddie also said that the deal is going through and that it benefits Filart to do this."

2/15/2011 "Dropped off Jan check. Also we discussed the deal w Filart, SNF assignments, and admisisons volume. Also set the meeting with JE, BEF and Yan."

Dr. Vincent Anthony
5/3/2010 "Met with Dr. Anthony. His app should be ready this week. He wants to get on staff... We can assist him w SNFs. He can help us fill the bag"

7/15/2010 "Met with provider. Established we will check in two weeks... he wants to expand SNF, RTHL and do hospital work for any referring accnts we introduce him too. He can commit to about 5 admits/month. Will take Joanne M to meet with him in the next 2 weeks (Dr. V. Anthony's name came up during her SNF rounds)."

1/21/2011 "This doctor may be someone Karen helps market and we may be able to see 5-10 admits per month."

Dr. Paul Baylon
8/2/2010 "Dropped off med staff app... Jessica will help me complete app... GR to check in wk of 08/09... perhaps I can take M. Roman so they can meet. Will need to set up another mtg with Baylon to discuss SMA again and his commitment level. We will do SMA once his app is approved with Med Staff... until then we can quanitify his true numbers."

Angel Med Clinic
6/7/2010 "Potential to work with his clinic, Angel Med Clinic... they have about 5 del per month... MSBS prog and $200 PO for gifts."

Dr. Daneshgar
7/21/2010 "Met with physician... he said Salceda spoke with him about working with PAMC... he is not interested at this time... but will keep us in mind... I pitched the idea of SMA and send deliveries to Salceda. He will call me though if anything should change."

Dr. Maged Faragalla

4/21/2010 "Met with Dr. F. GR dropped off sublease check. Discussed admissions."

5/25/2010 "Supposed to meet with Faragalla Weds at Mednik office. Supposed to get letter signed by MD re cancelling SMA."

5/26/2010 "Met with Dr. Faragalla, signed cancellation letter. RE: Washington clinic, he is waiting to speak with MR or BF re support at clinic, he is ready to sign lease. He asked about other clinics he can take over.. Think BF mentioned it to him. I also spoke with him admissions; told him he needs 5 every month. Told him no events in ELA or HP we rather do something in Hawthorne. He already got permit to do events. M. Roman can f/u."

6/9/2010 "Delv sublease ck to Faragalla. He said he is having health fair in two wkds wants Martha R to call him re details. Also talked to him about admissions… told him he only had couple in May and really need his support right now."

7/13/2010 "Met with MD to discuss sublease, and volume @ Aghapy. Told him we are terminating Sublease. And that numbers at Aghapy need improvement or else we may have to terminate that contract too. He suggested we meet Mon morning at his office. Will run it by M. Rivera and invite M Roman to attend."

7/27/2010 "Dropped off sublease… he had another pt this week for Med Surge… he wants to re-instate sublease… he says he will send us pts. He has send 3 pts since the letter. Also, spoke to him about OB volume. He asked about the retention person… he is open to any changes."

8/8/2010 "He sent another admission to us this week… per M. Rivera if he continued the trend of sending us pts weekly (which he has… I will track number and submit to RZ) we would cancel the cancellation letter. I need an update on this strategy."

8/25/2010 "Dr. Faragalla sent another admission this week… any chance we will be able to reinstate the sublease? Even if it is at a reduced rate?"

10/28/2010 "Met with Faragalla re admissions… he said he will try to send more patients but wants to know if we will restart the sublease? I told him

(per BEF last msg) if he admits 5+ consistently for 2-3 months we would do new sublease. He also mentioned some concerns re Sylvia in HP."

<u>Dr. Marcel Filart</u>
5/3/2010 "Visited and met with Dr. He knows my goal for him is 20... Also discussed with him the two candidates for Phys Guarantee. Presented him with the Cvs. MY helping me set up interview."

5/6/2010 "Spk w Md re interview next week with new provider and admissions."

7/27/2010 "Met with MD Fri, took KP and JM to his office. All is ok.. He mentioned some frustation with EHS... but he is handling it himself. All is ok... text him this morning re admissions. His mtg is about 12... we need 5 from him this week."

11/5/2010 "Meeting with BEF and Filart went well. He recommitted to 20 admits per month. We will ride the wave until Yan and Filart settle their agreement."

2/11/2011 "Met with MD... discussed volume and goal (18). He gave me names for this month... he is about 10."


<u>Dr. Gwen Flagg</u>
5/14/2010 "Delivered sublease check on Fri. Discussed with Lorena admissions. Told her we need to get to 7 in the next couple months. We will do flyers with clinic info to bring more awareness of PMAC to her pts."

6/9/2010 "Delv sublease ck. Talk to them re admissions. It looks better... 3 mtd."
12/14/2010 "Delivered gift. Discussed admissions. Spoke with Lorena and Dr. flagg seperately."

11/9/2010 "Dropped off sublease check. Checked in re admissions. They will send. Last month they had 6. They continue to push to send pts. There are a lot of pts that are new to practice that still want to go to Centinela (mostly the african american pts); she tries really hard to convince them to come to PAMC (we have seen an increase of those new pts to PAMC). I suggest we use the RTHL class in December to market to those seniors... maybe raffle

Turkeys too and have gifts for them (the gifts with our logo). Are we feeding them? I think we should; this is a good opportunity to market those seniors. In the past I told Lorena that I want her to get to at least 6-7 pts consistenly a month… that is just a couple more pts she can convince to come to PAMC that go to Centinela… she is trying. Maybe we can do the medicine bags with their info as well as PAMC info. Perhaps for next year. I think there is an opportunity with that population."

12/5/2010 "Dropped off sublease check for Dec. They will try to send pts; Lorena knows the commitment to us. She said they have been slow."

Dr. Cadrin Gill
4/22/2010 "Met with Gill. Dropped off sublease, consolidated April admissions."

7/26/2010 "Picked up contract and submitted to M Roman. All is good… he has about 5 pts mtd… he will push for more during the week."

9/10/2010 "Met with Gill, went over admissions… he is going on vacation from 09/11 until 09/19. Will check in couple weeks. Dropped off sublease check."

6/1/2010 "Met with MD, went over admission. MD met his goal for the month of May."

1/12/2011 "Delivered sublease check… talked to him re admissions."

11/2/2010 "Met with Dr. Gill… consolidated admissions for month of Oct. He says he should have more… but they were not on the list. He is going to get a list from the SNFs and let me know next week when I deliver sublease check."

11/9/2010 "Met with Gill and Eleanor re volume. He still committed. He said we should see volume pick up soon. In fact, Eleanor will call his SNFs to remind them to call PAMC for admissions."

Dr. Nijole Glaze
7/30/2010 "Met with Glaze re changing physicians from King to Liao… we will monitor the next 2 weeks to see how pts respond. They continue to be supporters of PAMC… I reminded both Dr. Glaze and Monica (manager) of

33

the goal and asked them to push for 2 or 3 more pts a month, as they are requesting assistance from us for their newly opened location in LA."

1/20/2011 "Visited Dr. Glaze re Dr. Liao issue… all is good. Glaze did bring up that they have increase marketing efforts resulting in about 40 new Obs… we should get to at least 15 dels per month… once they do.. We will increase mrkt… until then can we have an open PO with them for $200 per month?"

8/19/2010 "Jim was here at office, was able to briefly discuss increasing OB volume at  their site in Lynwood. The avg is about 9 dels, targeted goal is 10… I am asking him to push for 13 dels. He said he will speak with his staff."

11/3/2010 "Spoke with Jim re OB marketing. He said they are putting additional resources to increase volume… they want to know if we are open to increasing marketing. They plan on increasing from 80-> 120 new patients, that will be at least another 5 deliveries per month. He said if we get 15/month how much can we increase??"

11/10/2010 "Spoke with Mroman re Dr. King possibly being the OB MD. We need BEF blessings. Per BEF last week, if they increase to 15 we will increase SMA… having King with them, may do the trick."

Dr. Alberto Jimeno
5/18/2010 "Met with Dr. Jimeno. They are very slow now. He is only admitting couple pts a month. And his SNF business has decreased dramatically. Not worth pursuin. Denise the manager wants us to help with the RTHL. However it is not worth it for us."

Dr. Anil Mohin
2/17/2011 "Met with MD and Francisco, discussed clinic volume, etc. They know our expectations in terms of volume and allocation of resources. For now put on hold."

6/15/2011 "Gave Francisco the sublease data sheet to complete so we can initiate sublease contract. Took Ilian to meet with Dr. Mohin and Francisco to get things situated with RHTL and the call center."

Dr. Naim
6/9/2010 "Spk with Dr. Naim, he is committing to 20-30 dels; he does about

50 total bw his three clinics…. He will refer to Salceda… He is looking for SMA… Need a budget… at least 6k…"

6/30/2010 "CV…  delvd contract. Dr. Naim still thinking about it. Will touch base end of week or early next week."

Dr. Hy Phung Ngo
11/3/2010 "Met with Ngo, he signed sublease contract. Also dropped off Juan Lepe's contract. Discussed volume with him."

11/11/2010  "Met with Ngo re Mitchell and SNF business, Wong and White Memorial, EDS and volume, overall volume, target admissions monthly and his overall commitment to PAMC… He is not going to Silverlake btw, focusing on MP, White, and PAMC. He is giving all SNFs to Mitchell. He conferenced call to set up mtg with us and her and to get commitment from her… he told her at least 5 admits per month. He committed to 15 total. Asked to give him until April 2011 to revise contract. As for DR. Wong, he is salary guarantee but is under Ngo and Ngo is going to bring him on as a partner bc they have really hit it off. That's the reason he wants us to hold on revising contract, he says he finally has a good foundation with his providers, bw Wong and Margaret, the NP. He feels strongly about his direction and wants to continue to be a strong partner. He definitely committed to 15."

11/22/2010 "Dropped off sublease checks, through out week have texted re admissions."

12/2/2010 "Dropped off contract and sublease check… discussed volume with Ngo. Still slow. Did help EDS with 2 admits and assisted Mitchell with admit from SNF"

2/11/2011 "Met with MD… He can commit to 15 per month… he wants assistance with new clinic- Dr. DF. Told him about physician Mixer."

Dr. Howard Ragland
8/5/2010 "Spk with his Corina his manager to discuss the Med Staff issue… she is assisting us… also she inquired about marketing… I told her to keep pushing as many deliveries and explained the same I explained to Ragland… about 3k for SMA, goal of 10-12 dels per month. This goal is attainable."

6/29/210 "Also talked about SMA… encouraged him and urged him to send

all deliveries to PAMC. He has agreed"

<u>Dr. Tomas Sevilla</u>
4/27/2010 "Called Sevilla re admissions, sublease. We are scheduled to meet for lunch on Fri, 04/30/2010 at 2pm."

5/20/2010 "RTHL classes in questions for month of June. Await Martha and PS assessment."

5/26/2010 "Spoke with Dr. Sevilla… he wants to do an event… I will press for 5 admissions… see what I can do. Not promising anything to him though."

7/7/2010 "Sevilla called. Spk to him briefly about admits/RTHL events. Same as last month.  We need to see at least 5 admits per month to do RTHL events moving forward."

<u>Dr. Cesar Velez</u>
5/6/2010 "Delv contract, thank them for the admissions mtd"

5/19/2010 "Per M. Rivera leave Med Staff issues alone… continue to encourage Admissions… will let the dust settle for now…. I will remind Velez that we have sublease and need his support."

6/1/2010 "Dropped off sublease check. Velez said all is fine. He reached his goal for the month of May."

12/7/2010 "Delivered sublease check. Second sublease is pending, he asked me about it. Velez continues to support us with admits."

B.  <u>Piper Allen (Physician Integration Manager) Access call notes.</u>

<u>Dr. Jeremiah Aguolu</u>
4/28/2010 "Dropped off flyers, Dr. happy with production, will have staff start using and also passing out to patients. Discussed patient admissions and we should start seeing them come our way ASAP, said he wills tart sending through Dr. Liu (gave him his contact numbers), also gave him staff list for complete list of specialist, agreed to bring back flowchart, admissions and x-ray forms. Look into appointment cards, will"

5/20/2010 "Texted that we still have not seen patients and are awaiting them."

5/25/2010 "Went by to find out if they truly have patients to send or not and that we have shown good faith through providing flyers. Spoke with his son who helps run the clinic.."

Dr. Mahesh Bhuta
3/1/2011 "Met with Dr. Bhuta and he is fine with proposed 1 referral for 1 local SNF patient relationship with PAMC."

Dr. Felipe Chu
4/21/2010 "Met with Dr., goes to multiple snf which includes is own Sunrise (99patients) Looking to expand snf base and increase senior base in clinic. Wants to come on staff. Will take application and discuss expectations of admissions."

4/29/2010 "Spoke with Donna, Will go Monday to take staff application and discuss strategy with Dr. Chu (RTHL)(SNF program)(Discuss admission goals)"

Dr. Steven Clark
5/18/2010 "Visited; Per S. Thomas shared the door hanger. Frankly discussed commitment for support from PAMC. Need to see good faith before any help. Will ask if we can start with 200 flyers for waiting room. Asked for 3-5 patients for good faith."

6/22/2010 "Met to discuss admissions and expectations. He knows also Pickett, Maxey and many docs I am working with. He will start bringing most surgeries and his current patients call 911 and are admitted mostly from home, we agreed to get a poster forwaiting room and flyers for patients to take hom and start knowing to call us when they need to be admitted. He will work on his surgeries and admissions."

Dr. Stephen Copen
4/23/2010 "Physician Busy with patients, dropped off Staff Application. Will do a follow up visit to discuss coming aboard, schedule to take Martha back to discuss RTHL program. To discuss admission goals/expectations"

Dr. Cadrin Gill

6/11/2012 "Met with Dr. Gill, he gave me his list of SNF patients, will review
with Brandon and Michael.  He wants an ETA on the RTHL education
program (Topics and dates0 Very important for him. He is working to start
sending more patuients our way."

4/22/2013 "Met with Dr. Gill, just before arriving found out he is now in the
EHS system, LA and valley clinic, Melli is his rep. HC Partners was visiting
the same time I was. He is going to try HC Partners and EHS at the same time
to see who responds the best. Encouraged him to consolidate his IPA usage.
Re-iterated Brandon's message of using EHS and possibly getting sublease re-
instated."

Dr. Michael Guice

3/3/2011 "Met with Dr. Guice and he is interested in sub-lease with PAMC.
Would be able to direct 5 admits per mo."
Dr. Michael D. Hamilton

4/26/2013 "Encouraged him to be open minded at working with us on
opportunity (RTHL), maybe sublease (need to vet more) just joined EHS."
108 Dr. Lemmon McMillan

11/15/2012 "Met with McMillan and Digna to get contract signed, talk about
admissions. Digna has started having (Claudia) back office use our admission
log to keep trak of who Soliman and Daniels are sending to the hospital. I will
be checkin in weekly."

11/29/2011 "Went to deliver contract, Digna gone, check with Claudia about
admissons and using the log. No admissions yet .. Will follow up next week."

12/4/2012 "Met with McMillan to sign Hippa clause, gave him his copy.
Assured him that he would receive sublease check soon for both Nov and
Dec.., I will also have Ilian touch basis with Digna about specifics of their
RTHL program."

Dr. Malvin Yan

5/11/2012 "Met with Yan to fu from meeting with Gitter and Pesheski.
Assured himof the benefits from working with Gitter's group and the support
he will continue to receive from both PAMC and now Gitter's group. I
addressed the offer of $90 Medi and $130 Medi Medi from Gitter. Yan

wanted $150 but ok'd to settle with $135 only after I tried to ask for $140 for him. I addressed he must send admits to us first, not transferred to be counted as his monthly admissions. He wants me to come back with answer next week."

## XI. False and Fraudulent Claims and Statements

85.     The physicians and clinics with whom PAMC entered into financial relationships specified in paragraphs 72 - 82 above referred and admitted  patients for designated health services, including Medicare and Medicaid patients, to PAMC in violation of the Stark Statute and the Anti-Kickback Statute.

86.     PAMC and the PAMC partnership defendants, in turn, presented, or caused to be presented through the fiscal intermediary and MAC, claims for payment to the Medicare programs for designated health services provided on referrals and patient admissions from the physicians and clinics with whom they had entered into prohibited financial relationships as set forth in paragraphs 72 - 82. PAMC and the PAMC partnership defendants also presented, or caused to be presented through the State of California's Medicaid program, claims for payment to the Medicaid program for designated health services provided on referrals and patient admissions from the physicians and clinics with whom they had entered into prohibited financial relationships as set forth in paragraphs 72 - 82.  Defendants thereby obtained payments from the United States in violation of the Stark Statute and the Anti-Kickback Statute.

87.     Under the False Claims Act, 31 U.S.C. § 3729(a)(1) and Cal. Govt.

39

Code § 12651(a)(1), the claims resulting from these prohibited financial relationships were false and/or fraudulent because Defendants were prohibited by the Stark Statute and the Anti-Kickback Statute from obtaining payment from the United States and the State of California upon claims for designated health services provided on referrals and patient admissions from the physicians with whom they had entered into prohibited financial relationships as set forth in paragraphs 72 - 82.

88.     Defendants also violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) and Cal. Govt. Code § 12651(a)(2), by making false statements, or causing false statements to be made by the fiscal intermediary and MAC and to the State of California, to get claims paid by Medicare and Medicaid for designated health services provided on referrals and patient admissions from the physicians with whom they had entered into prohibited financial relationships as set forth in paragraphs 72 - 82. PAMC's certifications on its cost reports that its statements were "true" and/or "correct" and that it was entitled to payment of its claims for such services were false or fraudulent because the Stark Statute and Anti-Kickback Statute prohibited Defendants from receiving payments from the United States and the State of California for those claims.

89.     Defendants also violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) and Cal. Govt. Code § 12651(a)(3), by conspiring to commit the violations referred to above.

90.    Defendants knowingly made, used, and caused to be made or used false records and statements to conceal, avoid or decrease its obligations to pay or transmit money to the United States and to the State of California (i.e., to avoid refunding payments made in violation of the Stark Statute and the Anti-Kickback Statute) by certifying on their annual cost reports that the services were provided in compliance with federal law, all in violation of the False Claims Act, 31 U.S.C. § 3729(a)(7) and Cal. Govt. Code § 12651(a)(7).  The false certifications, made with each annual cost report submitted to the government, were part of Defendants' unlawful scheme to defraud Medicare and Medicaid.

91.    Defendants presented, or caused to be presented, all of said false claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent.

92.    On information and belief, it is alleged that this conduct is continuing.

## XII.  FIRST CAUSE OF ACTION
(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1) and (a)(1)(A))

93.    Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

94.    Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States, for designated health services rendered to patients who were referred or admitted by physicians with

41

whom PAMC had entered into prohibited financial relationships in violation of the Stark Statute and the Anti-Kickback Statute.

95.    Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## XIII.  SECOND CAUSE OF ACTION
(False Claims Act: Using False Statements to Get False Claims Paid)
(31 U.S.C. § 3729(a)(1)(B))

96.    Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

97.    Defendants made, used, and caused to be made or used, false records or statements — *i.e.,* the false certifications and representations made and caused to be made by defendants when initially submitting the false claims for payments and the false certifications made by PAMC in submitting the cost reports — to get false or fraudulent claims paid and approved by the United States.

98.    Defendants' false certifications and representations were made for the purpose of getting false or fraudulent claims paid and payment of the false or fraudulent claims was a reasonable and foreseeable consequence of the Defendants' statements and actions.

99.    The false certifications and representations made and caused to be made by Defendants were material to the United States' payment of the false claims.

42

100.   Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## XIV.  THIRD CAUSE OF ACTION
(False Claims Act: Conspiracy)
(31 U.S.C. § 3729(a)(3) and (a)(1)(C))

101.   Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

102.   Defendants conspired to commit the violations of the False Claims Act set forth in Causes of Action One and Two.

## XV.  FOURTH CAUSE OF ACTION
(False Claims Act: False Record Material to Obligation to Pay)
(31 U.S.C. § 3729(a)(7) and (a)(1)(G))

103.   Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

104.   Defendants made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.

105.   Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

43

## XVI.  FIFTH CAUSE OF ACTION
(California False Claims Act: Presentation of False Claims)
(Cal. Govt. Code § 12651(a)(1))

106.   Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

107.   Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the State of California, for designated health services rendered to patients who were referred or admitted by physicians with whom PAMC had entered into prohibited financial relationships in violation of the Stark Statute and the Anti-Kickback Statute.

108.   Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## XVII.  SIXTH CAUSE OF ACTION
(California False Claims Act: Using False Statements to Get False Claims Paid)
(Cal. Govt. Code § 12651(a)(2))

109.   Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

110.   Defendants made, used, and caused to be made or used, false records or statements — *i.e.,* the false certifications and representations made and caused to be made by defendants when initially submitting the false claims for payments and the false certifications made by PAMC in submitting the cost reports — to get false or fraudulent claims paid and approved by the State of California.

111.   Defendants' false certifications and representations were made for the purpose of getting false or fraudulent claims paid and payment of the false or fraudulent claims was a reasonable and foreseeable consequence of the Defendants' statements and actions.

112.   The false certifications and representations made and caused to be made by Defendants were material to the State of California's payment of the false claims.

113.   Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

### XVIII.  SEVENTH CAUSE OF ACTION
(California False Claims Act: Conspiracy)
(Cal. Govt. Code § 12651(a)(3))

114.   Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

115.   Defendants conspired to commit the violations of the False Claims Act set forth in Causes of Action Five and Six.

### XIX.  EIGHTH CAUSE OF ACTION
(California False Claims Act: False Record Material to Obligation to Pay)
(Cal. Govt. Code § 12651(a)(4))

116.   Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

117.   Defendants made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the State of California, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the State of California.

118.   Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

119.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.  The false or fraudulent claims were presented by thousands of separate transactions.  Relator has no control over or dealings of Defendants' billings and has no access to the records in their possession.

## XX.  **PRAYER FOR RELIEF**

WHEREFORE, *qui tam* plaintiff prays for relief as follows:

1.   For three times the dollar amount shown to have been wrongfully charged to and paid by the United States and by the State of California;

2.   For maximum civil penalties for all false records, statements, certifications and claims submitted to the United States and the State of California, subject to being consistent with the Excessive Fines and Penalties Clause of the Eighth Amendment to United States Constitution;

3.   For the maximum statutory *qui tam* share of the recovery obtained for

1  the United States and the State of California;

2

3      4.     For all other damages allowed under law, including litigation expenses

4  and reasonable attorneys' fees; and

5      5.     For such other and further relief as the court deems just and proper.

6

7

8                          **JURY DEMAND**

9

   *Qui Tam* Plaintiff hereby demands trial by jury.

10

11

12

13  Dated:   June 13, 2013          Respectfully submitted,
                                    Warren ■ Benson Law Group

14

15

16

17                                  Donald R. Warren
                                    Attorney for *Qui Tam* Plaintiff Paul Chan

18

19

20

21

22

23

24

25

26

27

28

                                   47