1  Donald R. Warren (CA 138933)
   Phillip E. Benson (CA 97420)
2  Warren - Benson Law Group
   7825 Fay Ave., Ste. 200
3  La Jolla, CA 92037
   Tel: 858-454-2877
4  Fax: 858-454-5878
   donwarren@warrenbensonlaw.com
5  philbenson@warrenbensonlaw.com

6  Attorneys for *Qui Tam* Plaintiff

7

8                UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
9                     WESTERN DIVISION

10  UNITED STATES OF AMERICA          CASE NO.  13 cv 04273 - RGK (MRWx)
    AND STATE OF CALIFORNIA,
11  ex rel John Doe,

12        Plaintiffs,                 QUI TAM PLAINTIFF'S [PROPOSED]
                                      THIRD AMENDED COMPLAINT
13  v.

14
    PAMC, LTD.; and PACIFIC
15  ALLIANCE MEDICAL CENTER,
    INC.,
16
          Defendants
17

18

19

20

21

22

23

24

25

26

27

28

# Table of Contents

**Page**

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

I.      Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.     Jurisdiction and Venue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

III.    Parties.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

IV.     The False Claims Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

V.      The California False Claims Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

VI.     The Medicare Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

VII.    The Medicaid Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

VIII.   Disproportionate Share Hospital Payments. . . . . . . . . . . . . . . . . . . .  15

IX.     The Stark Statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

X.      The Anti-Kickback Statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

XI.     The Civil Monetary Penalties Statute. . . . . . . . . . . . . . . . . . . . . . . .  23

XII.    Defendants' Misconduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

        A.  Overview of Remuneration to Physicians to Induce Referrals.. . . . . .  24

            Medicare and Medi-Cal comprise almost all of PAMC's revenue..  25

            PAMC's management, including the Vice President of Business
            Development, approves all referring physician compensation
            arrangements, despite their obvious Stark Statute and
            Anti-Kickback violations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

            PAMC tracks referrals and threatens to cancel arrangements
            if "target" number of referrals is not met. .. . . . . . . . . . . . . . . . . .  30

            PAMC's "Physician Integration" marketing team. . . . . . . . . . . . .  30

            Compensation arrangements for referring physicians and clinics. .  31

1.) Road To Healthy Living ("RTHL") Sublease Scheme to Induce Referral of Medicare Patients. . . . 33

2.) Mama Saludable, Bebe Saludable: Healthy Mom, Healthy Baby ("MSBS") Sublease Scheme to Induce the Recommendation and Referral of Medi-Cal Maternity Patients. . . . . . . . . . . . . . . . . . . . . . . . . . 35

3.) Shared Marketing Agreements ("SMA") Scheme to Induce the Recommendation and Referral of Medi-Cal Maternity Patients. . . . . . . . . . . . . . . . . . . 36

4.) Vendor Marketing Agreements Scheme to Induce the Recommendation and Referral of Medi-Cal Maternity Patients and Medicare Patients. . . . . . . . . . 39

5.) "Medical Directorships" to Induce the Recommendation and Referral of Medi-Cal and Medicare Patients. . . . . . . . . . . . . . . . . . . . . . . . 40

B. Direct Remuneration to Induce Patients to Purchase Facility Usage and Services from PAMC hospital.. . . . . . . . . . . . . . . . . . . . . . 41

C. PAMC, Ltd. Made or Used a False Statement Material to an Obligation to Pay Money to Medicare and Medi-Cal. . . . . . . . . . . . . 43

D. PAMC, Ltd.'s and Pacific Alliance Medical Center, Inc's Improper Avoidance of Their Joint and Several Obligation to Repay Medicare and Medi-Cal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

XIII. Document  Examples  of  PAMC's  Violations. . . . . . . . . . . . . . . . . . . . . 45

A. Marketing Notes Documenting How PAMC's Compensation Arrangements Take Into Consideration the Volume of Referrals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Gioconda Rodriguez (Director of Physician Integration) Access call notes. . . . . . . . . . . . . . . . . . . . . . . 46

Piper Allen (Physician Integration Manager) Access call notes.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

B. Partial List of Physicians and Clinics with Compensation Arrangements in Which the Payment Amounts Take Into Consideration the Volume of Referrals/Admissions, and are Made with a Purpose to Induce Referrals.. . . . . . . . . . . . . . . . 56

       C.     PAMC Internal Analyses Tying Compensation
             Arrangements to Volume of Referrals. . . . . . . . . . . . . . . . . . . . . .  59

XIV.   False and Fraudulent Claims and Statements. . . . . . . . . . . . . . . . . . . . . .  66

XV.    First Cause of Action
     (False Claims Act: Presentation of False Claims)
     (31 U.S.C. § 3729(a)(1) and (a)(1)(A))
     (Against PAMC, Ltd.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  68

XVI.   Second Cause of Action
     (False Claims Act: Using False Statements to Get False Claims Paid)
     (31 U.S.C. § 3729(a)(2) and (a)(1)(B))
     (Against PAMC, Ltd.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  68

XVII.  Third Cause of Action
     (False Claims Act: Using False Record Material to
     an Obligation to Pay Money)
     (31 U.S.C. § 3729(a)(7) and (a)(1)(G))
     (Against PAMC, Ltd.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  69

XVIII. Fourth Cause of Action
     (False Claims Act: Improperly Avoiding Obligation to Pay Money)
     (31 U.S.C. § 3729(a)(7) and (a)(1)(G))
     (Against PAMC, Ltd. and Pacific Alliance Medical Center, Inc.). . . . . .  69

XIX.   Fifth Cause of Action
     (California False Claims Act: Presentation of False Claims)
     (Cal. Govt. Code § 12651(a)(1))
     (Against PAMC, Ltd.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  70

XX.    Sixth Cause of Action
     (California False Claims Act: Using False Statements
     to Get False Claims Paid)
     (Cal. Govt. Code § 12651(a)(2))
     (Against PAMC, Ltd.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  70

XXI.   Seventh Cause of Action
     (California False Claims Act: Using False Record Material to
     an Obligation to Pay Money)
     (Cal. Govt. Code § 12651(a)(4))
     (Against PAMC, Ltd.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  71

XXII.   Eighth Cause of Action
(California False Claims Act: Improperly Avoiding
Obligation to Pay Money)
(Cal. Govt. Code § 12651(a)(4))
(Against PAMC, Ltd. and Pacific Alliance Medical Center, Inc.)...... 71

XXIII. Ninth Cause of Action
(Joint and Several Liability of General Partner)
(Cal. Corp. Code §§ 15904.04, 05)............................... 72

XXIV. Additional Records........................................ 72

XXV.   Prayer for Relief.......................................... 72

*Qui Tam* Plaintiff Paul Chan suing for himself (named in caption as John Doe), and for the United States and the State of California, alleges as follows[1]:

## I. INTRODUCTION

1.      For years, Defendant PAMC, Ltd. has brazenly violated the Stark Statute and the Anti-Kickback Statute by paying doctors as an inducement to refer patients to PAMC hospital.  One referring doctor, who initially balked at a kickback offer which required that he admit 15 - 20 patients per month, stated: "There are Stark laws."  Shortly after the doctor also asked the PAMC's Interim Vice President of Business Development if she would put the offer in writing, the Interim V.P. of Business Development retorted, "*Fuck that.  I'm not putting that in writing.*"

2.      PAMC, Ltd. is a fully integrated healthcare company with different lines of business including not only 1) PAMC hospital, but also 2) a managed care organization, 3) two Independent Practice Associations which contract with independent physicians to provide services to managed care, and 4) a 50% ownership in a health plan specifically for Medi-Cal (California's Medicaid) patients.  In the operation of its PAMC hospital business segment, PAMC, Ltd. has knowingly engaged in a pervasive scheme to pay illegal compensation/remuneration to referring physicians in violation of the Stark Statute and the Anti-Kickback Statute, resulting in PAMC's submission of false claims to Medicare and Medi-Cal totaling more than $15 million per year for at least the past nine years, all of which is within the applicable statute of

---

[1]Pursuant to the decision of the Ninth Circuit Court of Appeals in *Lacey v. Maricopa County*, 693 F.3d 896, 925-928 (2012), claims alleged in the First Amended Complaint that have been dismissed with prejudice and that are not realleged herein are not waived and are preserved for appeal.  Those claims involve allegations as to the liability of Dr. Shin-Yin Wong; Dr. George Ma; Dr. Tit Li; Dr. Carl Moy; Dr. Thick Gong Chow and Dr. Stephen Kwan.

limitations.  Mandatory treble damages in this action exceed $400 million.

3.     Beginning before 2006, and continuing, PAMC, Ltd., entered into various illegal compensation arrangements to pay physicians, clinics and medical corporations which were large volume referrers of patients to PAMC hospital. These illegal compensation/remuneration arrangements were used to funnel remuneration to referring providers and included prohibited sublease arrangements, marketing arrangements, and medical directorships.  The amount of compensation/remuneration payments made by PAMC, Ltd. in these arrangements always took into consideration the volume of the providers' patient referrals to PAMC, in violation of the Stark Statute, and were knowingly and wilfully made with a purpose to induce referrals, in violation of the Anti-Kickback Statute.  As a result, PAMC was statutorily prohibited from presenting claims to Medicare or Med-Cal for these referred patients, and any such claims were not reimbursable by Medicare or Medi-Cal.

4.     Additionally, PAMC, Ltd. for years has paid illegal remuneration directly to Medi-Cal covered expectant mothers as an inducement to purchase or order hospital maternity services from PAMC hospital and it explicitly conditioned each woman's ability to receive this kickback remuneration on her order and purchase of such maternity delivery services from PAMC, in violation of the Anti-Kickback Statute and the Civil Monetary Penalties Statute.  All the while, PAMC falsely certified in its Hospital Cost Report each year that its claims were made in compliance with these statutes.

5.     By knowingly submitting false claims for reimbursement in violation of the Stark Statute and the Anti-Kickback Statute, and by knowingly falsely certifying compliance with the Stark Statute, the Anti-Kickback Statute and the Civil Monetary Penalties Statute in its Cost Report, PAMC, Ltd. violated the False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq., the California False Claims Act ("CA FCA"), Cal. Gov. Code § 12650 *et seq*.

## II. JURISDICTION AND VENUE

6.     The Court has subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345.  The Court has subject matter and supplemental jurisdiction over the California False Claims Act claims pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).  The Court has supplemental jurisdiction over the California Corporations Code claim for general partner joint and several liability pursuant to 28 U.S.C. § 1367. The Court may exercise personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a).

7.     Venue is proper in the Central District of California under 31 U.S.C. § 3732 and 28 U.S.C. **§§** 1391(b) and (c) because the defendants reside in this District and because the defendants committed acts within this district that violated 31 U.S.C. § 3729.

## III. PARTIES

8.     *Qui Tam* Plaintiff Paul Chan ("Chan") is a resident of the United States, residing in the Central District of California.  In April 2013, Mr. Chan became employed as a Senior Manager of Physician Integration for Pacific Alliance Medical Center ("PAMC hospital").  It is in this capacity that Mr. Chan gained personal knowledge of the facts set forth in this action.  Because of PAMC's rampant violations of the Stark Statute and the Anti-Kickback Statute, Mr. Chan resigned from his employment in September 2013.

9.     Defendant PAMC, Ltd. ("PAMC") is a California limited partnership, with headquarters located in Los Angeles, California.  In addition to its other lines of business, PAMC, Ltd. does business as Pacific Alliance Medical Center ("PAMC hospital") which is an acute care hospital in Los Angeles.

10.     Defendant Pacific Alliance Medical Center, Inc. is a California corporation, with headquarters located in Los Angeles, California.  Pacific Alliance Medical Center, Inc. is the general partner of PAMC, Ltd.  As PAMC's operating general partner, Pacific Alliance Medical Center, Inc. has the joint and

several obligation to return monies wrongfully received from Medicare and Medi-Cal.  By improperly avoiding its obligation, Pacific Alliance Medical Center, Inc. violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), and the California False Claims Act, Cal. Govt. Code § 12651(a)(7).

## IV. **THE FALSE CLAIMS ACT**

11.     The FCA provides, in pertinent part, that a person who:
(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(a)(1)(B)  knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(a)(1)(G)  knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains. . . .

31 U.S.C. § 3729.[2]

For purposes of the False Claims Act,

the term "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the

---

[2]The FCA was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009. Given the nature of the claims at issue, Sections 3279(a)(1), (2) and (7) of the prior statute, and Section 3729(a)(1)(A), (B) and (G) of the revised statute are all applicable here. Sections 3729(a)(1), (2) and (7) apply to conduct that occurred before FERA was enacted, and sections 3729(a)(1)(A), (B) and (G) apply to conduct after FERA was enacted. Section 3729(a)(1)(B) is applicable to this case by virtue of Section 4(f) of FERA, which makes the new changes to that provision applicable to all claims for payment pending on or after June 7, 2008.

information; or (3) acts in reckless disregard of the truth or falsity of the information; and require no proof of specific intent to defraud. 31 U.S.C. § 3729(b).

## V. <u>THE CALIFORNIA FALSE CLAIMS ACT</u>

12.   The California False Claims Act provides, in pertinent part:

(a) Any person who commits any of the following enumerated acts in this subdivision shall have violated this article and shall be liable to the state or to the political subdivision for three times the amount of damages that the state or political subdivision sustains because of the act of that person. A person who commits any of the following enumerated acts shall also be liable to the state or to the political subdivision for the costs of a civil action brought to recover any of those penalties or damages, and shall be liable to the state or political subdivision for a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars $10,000) for each violation:

> (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> (7)  knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or any political subdivision,

Cal. Govt. Code § 12651(a)(1-3, 7).

> For purposes of the California False Claims Act,
> the term "knowing" and "knowingly" mean that a person, with

respect to information (A) has actual knowledge of the information; (B) acts in deliberate ignorance of the truth or falsity of the information; or (C) acts in reckless disregard of the truth or falsity of the information.  Proof of specific intent to defraud is not required.

Cal. Govt. Code § 12650(b)(A - C).

## VI. THE MEDICARE PROGRAM

13.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of healthcare services for certain individuals. The Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare program, which it does through CMS, an agency of HHS.

14.     Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. See 42 U.S.C. §§ 1395c-1395i-4. Part B primarily covers physician and other ancillary services. See 42 U.S.C. § 1395k.

15.     Historically, to assist in the administration of Medicare Part A, CMS contracted with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries, typically insurance companies, were responsible for processing and paying claims and cost reports.

16.     To assist in the administration of Medicare Part B, CMS contracted with "carriers." Carriers, typically insurance companies, were responsible for processing and paying Part B claims.

17.     Beginning in November 2006, Medicare Administrative Contractors ("MACs") began replacing both the carriers and fiscal intermediaries. See Fed. Reg. 67960, 68181 (Nov. 2006). The MACs generally act on behalf of CMS to process and pay Part A and Part B claims and perform administrative functions on a regional level. See 42 § C.F.R. 421.5(b).

18.     Institutional providers that wish to be eligible to participate in

Medicare Part A must periodically sign an application to participate in the program. The application, which must be signed by an authorized representative of the provider, contains a certification statement that states

> "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare."

CMS Form 855A, Medicare Enrollment Application - Institutional Providers.

19.    Under the Medicare program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient and outpatient services.

20.    Upon discharge of Medicare beneficiaries from a hospital, the hospital submits Medicare Part A claims for interim reimbursement for inpatient and outpatient items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64.  Hospitals submit patient-specific claims for interim payments on a Form UB-92 or UB-04.

21.    As detailed below, PAMC submitted false claims to the Medicare program for specific patient hospital services, including its facilities fees and general and administrative costs incurred in treating Medicare beneficiaries illegally obtained in violation of the Stark Statute and Anti-Kickback Statute.

22.    As a further prerequisite to payment by Medicare, including payment of Medicare Disproportionate Share Hospital ("DSH") funds, PAMC was also required to submit annually a form CMS-2552, more commonly known as the hospital cost report. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; s*ee also* 42 C.F.R. § 405.1801(b)(1).  Cost reports are the final claim that a provider submits to the fiscal intermediary or MAC for items and services rendered to Medicare beneficiaries each year.

23.    After the end of each hospital's fiscal year, the hospital files its

hospital cost report with the fiscal intermediary or MAC, stating the amount of Part A hospital reimbursement the provider believes it is due for the year. See 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. See also 42 C.F.R. § 405.1801(b)(1). Medicare relies on the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. See 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

24. During the relevant time period, Medicare Part A payments for hospital services were determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s and UB-04s) during the course of the fiscal year. On the hospital cost report, this Medicare liability for services is then totaled with any other Medicare Part A liabilities owed to the provider. This total determines Medicare's true liability for services rendered to Medicare Part A beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare Part A program or the amount due the provider.

25. Under the rules applicable at all times relevant to this complaint, Medicare, through its fiscal intermediaries and MACs, had the right to audit the hospital cost reports and financial representations made by PAMC to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right includes the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made. See 42 C.F.R. § 413.64(f).

26. Therefore, if patient days attributable to patients for whom there was a kickback arrangement or other illegal compensation arrangement, those Medicare claims are disallowed on a PAMC cost report due to the patients having been associated with kickbacks, and the hospital will have been overpaid by Medicare and the DSH funds program.

27.     In order to be reimbursed by Medicare, a hospital executive must execute an express certification in the cost report. Further, Medicare and Medi-Cal rely on the truthfulness of the certifications and the Cost Report in determining the issues of payment and retention of payment:

> "The cost report and certification process is a self-policing mechanism that is critical to the national effort to prevent and remedy fraud and abuse in the public health care financing system, since the government can review only a small fraction of the claims submitted and therefore must rely on them."

*Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017 (S.D. Texas 1998).

28.     The cost report cautions the hospital about the severity of fraud or falsification and states as follows:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

29.     This advisory is followed by the actual Certification language itself:

> I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as

noted.  I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

30. Thus, for all relevant years, PAMC was required to certify, and did certify that the filed hospital cost report is (1) truthful, i.e., that the cost information contained in the report is true and accurate; (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, i.e., that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations, including the Stark Statute, Anti Kickback Statute and Civil Monetary Penalties Statute.  *Thompson v. Columbia/HCA Healthcare Corp*., 20 F. Supp. 2d 1017 (S.D. Texas 1998) (In action involving only Stark Statute and Anti-Kickback Statute allegations, Cost Report certification was held to certify compliance with Stark Statute and Anti-Kickback Statute as part of applicable instructions.)

31.     For each of the years at issue, PAMC submitted cost reports to its Fiscal Intermediary or MAC falsely attesting, among other things, to the certification quoted above.  These certifications were false, for the reasons set forth in this Complaint, including the false certification of compliance with the Stark Statute, the Anti-Kickback Statute and the Civil Monetary Penalties Statute. The truthfulness of these certifications was, and is, material to the United States' and the State of California's decision regarding the hospital's ability to retain Medicare, Medi-Cal and DSH funds funds via its Cost Report claim.

32.     Courts have consistently held that non-compliance with the Stark Statute and/or the Anti-Kickback Statute renders claims unreimbursable.  This requirement is also statutorily mandated. 42 U.S.C. § 1395nn(g) [Stark Statute]; 42 U.S.C. § 1320a-7b(g) [Anti-Kickback Statute].  Further, violation of the Anti-Kickback Statute is a felony.  Indeed, as part of the comprehensive health care

reform legislation enacted in 2010, Congress amended the Anti-Kickback Statute to reiterate that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]." Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148, § 6402(f), 124 Stat. 119.

33.    Compliance with the Civil Monetary Penalties Statute's "Improperly filed claims" section, 42 U.S.C. § 1320a-7a, also is material to Medicare's and Medi-Cal's decision regarding a provider's cost report claim.  In addition to the felony criminal designation mandated in the Anti-Kickback Statute, and the conditions of payment mandated in the Stark Statute and the Anti-Kickback Statute, compliance with the Civil Monetary Penalties Statute is so central to the Medicare and Medicaid programs that a healthcare entity which submits claims for patients who were given direct remuneration which the provider

"knows or should know is likely to influence such individual to order or receive from a particular provider... any item or service for which payment may be made, in whole or in part"

by Medicare or Medi-Cal is subject to civil monetary penalties of  $10,000 for each such claim billed to Federal Healthcare Programs or State Healthcare Programs, $10,000 for each day the prohibited relationship occurs, treble damages payable to the United States or the State agency (California Medi-Cal), and exclusion from Federal and State Healthcare programs.  Civil Monetary Penalties Statute "Improperly filed claims", 42 U.S.C. § 1320a-7a.  These substantial penalties reflect the significance of the prohibition against kickbacks to referrers or patients as a critical tool in the fight against health care fraud. The public policy behind the Civil Monetary Penalties Statute is the same public policy behind the Anti-Kickback Statute. See Anti-Kickback Statute policies,  H. Rep. 95-393, 95th Cong., 1st Sess. at 44, reprinted in 1977 U.S.C.C.A.N. 3039, 3047 (explaining that fraud in federal health care programs "cheats taxpayers who must

ultimately bear the financial burden of misuse of funds in any government-sponsored program"). PAMC's claims at issue in this action would not have been paid if Medicare and Medi-Cal had known of PAMC's false certification in its Cost Reports.

34. In addition to making a truthful certification of compliance with the Stark Statute, Anti-Kickback Statute and the Civil Monetary Penalties Statute, a hospital is required to disclose all known errors and omissions in its claims for Medicare Part A reimbursement (including its cost report final claim) to its fiscal intermediary or MAC.

35. PAMC was not entitled to payment of its claims submitted to Medicare for hospital services provided to patients who were referred or admitted to PAMC in violation of the Stark Statute, the Anti-Kickback Statute. As a result, PAMC's submission of these claims, including its Cost Report Claim, was the submission of false claims in violation of 31 U.S.C. § 3729(a)(1)(A). Submission of the false certification in the PAMC cost reports was also a violation of 31 U.S.C. § 3729(a)(1)(B) and (a)(1)(G).

36. In addition to Part A claims, doctors or other providers submit Medicare Part B claims to the carrier or MAC for payment.

37. Under Part B, Medicare will generally pay 80 percent of the "reasonable" charge for medically necessary items and services provided to beneficiaries. *See* 42 U.S.C. §§ 1395l (a)(1), 1395y(a)(1). For most services, the reasonable charge has been defined as the lowest of (a) the actual billed charge, (b) the provider's customary charge, or (c) the prevailing charge for the service in the locality. *See* 42 C.F.R. §§ 405.502-504.

38. Not surprisingly, in order to prevent waste, fraud and abuse, the Social Security Act, 42 U.S.C. § 1395y(a)(1) states the Medicare Program is only authorized to pay for items and services that are medically "reasonable and necessary." The Secretary of HHS is authorized to define what services meet that

criteria. 42 U.S.C. § 1395ff(a). Medicaid and other federally funded programs also only pay for items and services that are medically "reasonable and necessary."

39. Medicare providers have a legal duty to familiarize themselves with Medicare's reimbursement rules, including those stated in the Medicare Manuals. *Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 64-65 (1984). A provider's failure to inform itself of the legal requirements for participation in the program acts in reckless disregard or deliberate ignorance of those requirements, either of which is sufficient to charge it with knowledge of the falsity of the claims or certifications in question, under the False Claims Act. *United States v. Mackby,* 261 F.3d 821, 828 (9th Cir. 2001). These duties also apply to Medi-Cal providers.

## VII. THE MEDICAID PROGRAM

40. Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

41. Medi-Cal is the name used by the Medicaid program operating in the State of California. As a result of its involvement in the Medicaid program, the State of California provides half of the funds used to provide medical treatment through the Medi-Cal program.

42. The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called Federal Financial Participation (FFP). 42 U.S.C. §§ 1396 et seq.

43. In order to qualify for FFP, each state's Medicaid program must meet certain minimum requirements, including the provision of hospital services to Medicaid beneficiaries. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

44.     In the State of California, provider hospitals participating in the Medicaid program submit claims for hospital services rendered to beneficiaries to the State for payment.

45.     In addition, the State of California requires hospitals participating in the Medicaid program to file a copy of their Medicare cost report with the State, and the State relies on the certification by the provider that it has complied with the Stark Statute, the Anti-Kickback Statute and the Civil Monetary Penalties Statute.

46.     The State of California relies on the hospital cost report certification made by the hospital to determine whether Medi-Cal payments to the hospital were payable under the Medi-Cal system and also whether the hospital owes money back to the Medi-Cal program or is entitled to additional funds from the Medi-Cal program.  To assist in the administration of claims, Medi-Cal contracts with "fiscal intermediaries" to act as its agents and to whom Medi-Cal providers submit their claims for payment.  These fiscal intermediaries are responsible for processing and paying claims.

47.     For the years relevant to this Complaint, PAMC submitted its Medi-Cal claims, including the annual Cost Report (with the Cost Report certification), to the State of California's fiscal intermediaries.  These claims and certifications were false, for the reasons set forth in this Complaint, including the false certification of compliance with the Stark Statute, the Anti-Kickback Statute and the Civil Monetary Penalties Statute.  The truthfulness of these certifications was, and is, material to the State of California's Medi-Cal decision regarding the hospital's ability to retain Medi-Cal funds via its Cost Report claim.  Further, PAMC's submission of these false claims to Medi-Cal caused the State of California to submit false claims to the United States for the federal portion of the Medicaid funds that paid PAMC's false Medi-Cal claims, as those underlying claims associated with kickbacks were not reimbursable and not eligible for

Federal Financial Participation.

48.    Like all Medi-Cal providers, PAMC agreed in its Medi-Cal Enrollment Application to abide by all State and federal laws and regulations governing and regulating Medicaid providers.  PAMC further agreed in its Enrollment Application to "not engage in or commit fraud and abuse," including deception or misrepresentation to obtain an unauthorized benefit.  Payment of any Medi-Cal claim is conditioned upon, among other things, compliance with the Stark Statute, the Anti-Kickback Statute.  PAMC's certification and compliance with the Anti-Kickback Statute, the Stark Statute and the Civil Monetary Penalties Statute was and is a material condition to its ability to receive or retain any Medi-Cal reimbursement payments.   Medi-Cal allowable costs for inpatient hospital services is determined in accordance with, and cannot exceed, applicable Medicare standards and principles of reimbursement. 22 Calif. Code of Regulations 51536.

49.    PAMC was not entitled to payment of its claims submitted to Medi-Cal for hospital services provided to patients who were referred or admitted to PAMC in violation of the Stark Statute, the Anti-Kickback Statute.  As a result, PAMC's submission of these claims, including its Cost Report Claim, was the submission of false claims in violation of Cal. Govt. Code § 12651(a)(1). Submission of the false certification in the PAMC cost reports was a violation of Cal. Govt. Code § 12651(a)(2).

## VIII. <u>DISPROPORTIONATE SHARE HOSPITAL PAYMENTS</u>

50.    Until enactment of the Social Security Amendments of 1983, Medicare payments for hospital inpatient services were based on the costs incurred by the hospital.  The 1983 amendments created the hospital inpatient prospective payment system under which acute care hospitals were paid a fixed rate for the operating costs incurred in treating patients in each diagnosis-related group.  The legislation included a provision (42.U.S.C. § 1395ww(a)(2)(B)) that

allowed for "such exceptions and adjustments to the payment amounts...as the Secretary [of Health and Human Services] deems appropriate to take into account the special needs of public or other hospitals that serve a significantly disproportionate number of patients who have low income." This additional reimbursement is known as Disproportionate Share Hospital ("DSH") funding. Because PAMC serves a disproportionately large number of low income patients, it receives additional payments for its services via both Medicare DSH payments and Medi-Cal DSH payments for the referred/admitted patients at issue in this action.

## IX. **THE STARK STATUTE**

51.     Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Statute") prohibits a hospital (or other entity providing designated health services) from submitting Medicare claims for designated health services (as defined in 42 U.S.C. § 1395nn(h)(6)) based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the hospital, and prohibits Medicare from paying any such claims.

52.     The Stark Statute establishes the clear rule that the United States will not pay for designated health services prescribed by physicians who have improper financial relationships with other providers. The statute was designed specifically to prevent losses that might be suffered by the Medicare program due to questionable utilization of designated health services.

53.     The Stark Statute explicitly states that Medicare may not pay for any designated health service provided in violation of the Stark Statute. See 42 U.S.C. § 1395nn(g)(1). In addition, the regulations implementing the Stark Statute expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353(d); 42 U.S.C. § 1395nn(g)(2).  Compliance

with the Stark Statute is also a condition of payment by any Medicaid Program. 42 U.S.C. § 1396b(s).

54.     Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider unless a statutory or regulatory exception applies. See Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

55.     In 1993, Congress passed Stark II, which extended the Stark Statute to referrals for ten additional designated health services and also extended its reach to Medicaid. See Omnibus Reconciliation Act of 1993, P.L. 10366, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

56.     The Stark Statute prohibits a hospital from submitting a claim to Medicare or Medicaid for "designated health services" that were referred to the hospital by a physician with whom the hospital has a "financial relationship," unless a statutory exception (none of which is applicable here) applies. "Designated health services" include inpatient and outpatient hospital services. See 42 U.S.C. § 1395nn(h)(6).

57.     In pertinent part, the Stark Statute provides:

(a) Prohibition of certain referrals
    (1)     In general
            Except as provided in subsection (b) of this section [not applicable here], if a physician . . . has a financial relationship with an entity specified in paragraph (2), then –
    (A)     the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
    (B)     the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited

under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

58.     Moreover, the Stark Statute provides that Medicare and Medicaid will not pay for designated health services billed by a hospital when the designated health services resulted from a prohibited referral under subsection (a). See 42 U.S.C. § 1395nn(g)(1).

59.     "Financial relationship", specified in  § 1395nn(a)(2), includes a "compensation arrangement," which means any arrangement involving any remuneration paid directly or indirectly, overtly or covertly, in cash or in kind, to a referring physician.  §§ 1395nn(h)(1)(A) and (B).

60.     The Stark Statute and companion regulations contain exceptions for certain compensation arrangements, none of which are applicable here. These exceptions include, among others, "bona fide employment relationships," "rental of office space and equipment,"  "personal services arrangements," "fair market value compensation," and "indirect compensation relationships."  However, to qualify as an exception, the remuneration and payments under these relationships and arrangements **must not be determined in a manner that takes into account the volume or value of any referrals.**

61.     In order to qualify for the Stark Statute's exception for bona fide employment relationships, compensation arrangements must meet, inter alia, the following statutory requirements: (A) the amount of the remuneration is fair market value and **not based on the value or volume of referrals**, and (B) the remuneration would be commercially reasonable even in the absence of referrals from the physician to the hospital. See 42 U.S.C. §§ 1395nn(e)(2)(B) and (e)(2)(B); 42 C.F.R. 411.357(c)(2)(ii) (**not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals**). (**Emphasis** added.)

62.     In order to qualify for the Stark Statute's exception for rental of

office space and equipment, the rental charges must be consistent with fair market value and **not determined in a manner that takes into account the volume or value of any referrals.** See 42 U.S.C. § 1395nn(e)(1)(A) and (B); 42 C.F.R. 411.357(a)(5)(i); (b)(4)(i) (**not determined in a manner that takes into account the volume or value of any referrals**). (**Emphasis** added.)

63.     In order to qualify for the Stark Statute's exception for personal services arrangements, a compensation arrangement must meet, inter alia, the following statutory requirements: (A) the compensation does not exceed fair market value, and (B) is **not determined in a manner that takes into account the volume or value of any referrals** or other business generated between the parties (unless it falls within a further "physician incentive plan" exception as described in the statute). See 42 U.S.C. § 1395nn(e)(3)(A)(v). 42 C.F.R. 411.357(d)(v) (**not determined in a manner that takes into account the volume or value of any referrals**). (**Emphasis** added.)

64.     A "physician incentive plan" under § 1395nn(e)(3) (not applicable here) is defined very narrowly, and only applies to compensation arrangements that "may directly or indirectly have the effect of reducing or limiting services provided with respect to individuals enrolled with the entity." 42 U. S. C. § 1395nn(e)(3)(B)(ii).

65.     In order to qualify for the Stark Statute's exception for fair market value compensation, there must be an agreement in writing, the agreement must set forth all services to be furnished, all compensation must be set in advance and consistent with fair market value, **the agreement must not take into consideration the volume or value of referrals** or other business generated by the referring physician, and the agreement must not violate federal or state law. See 42 C.F.R. § 411.357(l); 42 C.F.R. 411.357(l)(3) (**not determined in a manner that takes into account the volume or value of any referrals**) (**Emphasis** added.)

66.     In order to qualify for the Stark Statute's exception for indirect compensation arrangements, defined as any instance where compensation flows from the entity providing designated health services through an intervening entity and then to the referral source (see 42 C.F.R. § 411.354(c)(2)), there must be a written agreement, the compensation must be consistent with fair market value, **the compensation may not take into consideration the volume or value of referrals** or other business generated by the referring physician, and the agreement cannot violate the Anti-Kickback Statute. See 42 C.F.R. § 411.357(p)(1)(i) (**not determined in a manner that takes into account the volume or value of any referrals**). (**Emphasis** added.)

67.     Based on the compensation arrangements between referring physicians/clinics and PAMC, and the fact that PAMC's compensation to the referring physicians takes into consideration the volume of referrals generated by the referring physicians, none of the statutory or regulatory exceptions apply.

68.     The Stark Statute (and  the Anti-Kickback Statute) also applies to claims under Medicaid, and federal funds may not be used to pay for designated health services in a state Medicaid program where the claims result from violations of the Stark Statute. *See* 42 U.S.C. § 1396b(s).  Further, claims for designated health services resulting from a violation of the Stark Statute or the Anti-Kickback Statute are not eligible for reimbursement from California funds under Medi-Cal. *California Code of Regulations, title 22, section 51536* provides in pertinent part:

(a) Reimbursement for hospital inpatient services . . . shall be the lesser of the following for each hospital:
* * * *
(2) Allowable costs determined in accordance with applicable Medicare standards and principles of reimbursement.

69.     Because California's Medi-Cal reimbursement follows the applicable Medicare standards and principles of reimbursement (which include the

reimbursment prohibition for designated health services resulting from violations of the Stark Statute and the Anti-Kickback Statute), California funds may not be used to pay for Medi-Cal claims made in violation of the Stark Statute or the Anti-Kickback Statute.  Further, "the offer... or acceptance by any person... of any... consideration, whether in the form of money or otherwise... as compensation or inducement for referring patients... is unlawful" in California, and this crime is punishable by incarceration of up to a year.  Cal. Bus. & Prof. Code § 650.

## X. THE ANTI-KICKBACK STATUTE

70.    The federal health care Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that financial inducements can influence health care decisions and result in goods and services being more expensive, medically unnecessary, and harmful to patients.  To protect the integrity of federal health care programs, Congress prohibited the payment of kickbacks in any form, regardless of whether the kickback actually gives rise to overutilization or unnecessary care.  The AKS also reaches kickbacks concealed as legitimate transactions.  See Social Security Amendments of 1972, Pub. L. No. 92-603, §§242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare and Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

71.    The AKS prohibits, among other things, paying direct or indirect kickbacks where one purpose is to induce referrals for services paid under federal healthcare programs. The AKS arose out of Congressional concern that payoffs to those who can influence healthcare decisions corrupt professional healthcare decision-making and may result in federal funds being diverted to pay for goods or services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. The AKS prohibits payment of kickbacks in order to protect the integrity of the Medicare program from these difficult to detect harms. First enacted in 1972, the AKS was strengthened in 1977 and 1987 to

ensure that kickbacks masquerading as legitimate transactions do not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

72.     Compliance with the AKS is material and is a precondition to both a provider's participation in, and payment under, Medicaid, Medicare, TRICARE, the Federal Employee Health Benefit Program, and other federal health care programs.

73.     The AKS prohibits any person or entity from making or accepting payment where one purpose of the payment is to induce or reward any person for referring, recommending or arranging for federally-funded medical items and services, including items and services provided under the Medicare and Medi-Cal program.  In pertinent part, the statute states:

> (b) Illegal remuneration
>
>             * * *
>
> (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person-
>
> > (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> >
> > (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2). Violation of the statute can also subject the perpetrator to exclusion from participation in federal health care programs and civil monetary penalties of up to $50,000 per violation and up to three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7) (Anti-Kickback Statute); 42 U.S.C. § 1320a-7(a)(7) (Civil Monetary Penalties Statute).

74.     The AKS not only prohibits outright bribes, but also prohibits any indirect remuneration in kind by a hospital to a physician that has, as one of its purposes, inducement of the physician to refer patients for admission to the hospital.

75.     These provisions demonstrate Congress' commitment to the fundamental principle that federal health care programs will not tolerate the payment of kickbacks.  Thus, compliance with the Anti-Kickback Statute is a prerequisite to a provider's right to receive or retain reimbursement payments from Medicare, Medicaid and other federal health care programs.  The Anti-Kickback Statute is also a prerequisite to a provider's right to receive or retain reimbursement payments from California funds under the Medi-Cal program.

## XI. THE CIVIL MONETARY PENALTIES STATUTE

76.     The federal health care  Civil Monetary Penalties Statute, 42 U.S.C.§ 1320a-7a, also arose out of Congressional concern that financial inducements can harm the integrity of federal health care programs.

77.     The Civil Monetary Penalties Statute, 42 U.S.C.§ 1320a-7a, subsection (a) "Improperly filed claims", further clarifies the prohibition against offering or paying direct remuneration to a patient, which the provider

> "knows or should know is likely to influence such individual to order or receive from a particular provider... any item or service for which payment may be made, in whole or in part."

42 U.S.C.§ 1320a-7a(a)(5).

78.     A healthcare provider that violates 42 U.S.C.§ 1320a-7a(a)(5) and

submits these statutorily designated "Improperly filed claims" to Medicare or Medi-Cal is subject to civil monetary penalties of $10,000 for each such claim billed to Federal Healthcare Programs or State Healthcare Programs, $10,000 for each day the prohibited relationship occurs, treble damages payable to the United States or the State agency (California Medi-Cal), and exclusion from Federal and State Healthcare programs.  Civil Monetary Penalties Statute, 42 U.S.C.§ 1320a-7a.

## XII. **DEFENDANTS' MISCONDUCT**

79.    **A.  Overview of Remuneration to Physicians to Induce Referrals**. At all times relevant hereto, PAMC knew it was illegal to pay kickbacks for which one purpose was to induce the referral of patients for health services, or to enter into referring physician compensation arrangements in which the amount of compensation took into consideration the volume or value of patient referrals, or to offer or pay remuneration directly to patients as an inducement to purchase facility usage and services from PAMC hospital.  However, beginning before 2006 and continuing, PAMC knowingly and wilfully offered and paid remuneration to referring physicians and clinics with a purpose to induce referrals, by which PAMC:

    a.    entered into: 1) "sublease" agreements as an inducement and compensation for referring physicians, 2) Shared Marketing Agreements as an inducement and compensation for referring physicians and clinics, 3) Vendor Marketing Agreements as an inducement and compensation for referring physicians and clinics, 4) medical directorships as an inducement and compensation for referring physicians, and 5) offered and paid remuneration directly to patients as an inducement to purchase facility usage and services from PAMC hospital,  in violation of the Stark Statute, the Anti-Kickback Statute, and Civil Monetary Penalties Statute, specifically

by compensating the referring and admitting physicians and clinics via arrangements for which the payment amounts **are determined in a manner that takes into account the volume or value of referrals** of patients to PAMC for designated health services, and offering and gifting infant car seats and baby strollers to induce Medi-Cal covered expentant women to purchase facility usage and services from PAMC hospital; and

b.     knowingly submitted false claims for payment to Medicare and Medi-Cal for PAMC's hospital charges for designated health services rendered to patients who were referred or admitted to the hospital by these physicians with improper compensation arrangements, and patients to whom PAMC offered and paid remuneration directly.

80.     This conduct violated the False Claims Act, the California False Claims Act, the Stark Statute, the Anti-Kickback Statute and the Civil Monetary Penalties Statute.

81.     **Medicare and Medi-Cal comprise almost all of PAMC's revenue.** According to PAMC's Executive Summary Business Development Plan 2008:

> "As a percentage of total care, PAMC's main payor sources are Medicare and Medi-Cal.  Currently managed care and private insurance represent roughly less than 4% of cases, and self-pay represents approximately 3% of cases."

As a result, on information and belief, it is alleged that approximately 90% the PAMC's overall hospital care cases involve Medicare and Medi-Cal revenues, including Medicare DSH payments and Medi-Cal DSH payments.

82.     PAMC has a designated Vice President and an entire Business Development Department devoted to creating remuneration arrangements to pay and induce referring physicians for referrals.  Based on *Qui Tam* Plaintiff's personal observations and being trained in and working in PAMC's Business

Development Department, it is the primary work of the Business Development Department and the V.P. of Business Development to solicit high referring physicians to admit patients to the hospital or refer patients to another physician to arrange for the furnishing of services at PAMC hospital, and PAMC enters into illegal compensation/remuneration agreements to induce those referrals.

83.     The Vice President and the Business Development Department closely track the resulting patient referrals and the resulting cost/benefit of the hospital's remuneration payments, and send monthly status reports to the President of the Board of Directors, Dr. S.Y. Wong.  Additionally, the Vice President and the Business Development Department also create many other reports and business plans and budgets discussing the value of paying referring physicians to refer patients to the hospital, whether to continue paying the referring physicians, and whether the paid-referring-physicians are profitable for the hospital - - going so far as to label the paid-referring-physicians "Winners", "Grinners", "Slugs" and "Sinners", depending on the hospital's Return on Investment ("ROI") in paying each, and the number of resulting referrals.

84.     **PAMC's management, including the Vice President of Business Development, approves all referring physician compensation arrangements, despite their obvious Stark Statute and Anti-Kickback violations.**  PAMC, Ltd. is a sophisticated entity in the healthcare industry.  PAMC, Ltd. operates as a fully integrated  healthcare company with different lines of business including not only 1) PAMC hospital, but also 2) a managed care organization, 3) two Independent Practice Associations which contract with independent physicians to provide services to managed care, and 4) a 50% ownership in a health plan specifically for Medi-Cal (California's Medicaid) patients.

85.     PAMC files and keeps HHS OIG presentations on fraud and abuse issues, including the Stark Statute, the Anti-Kickback Statute and the Civil Monetary Penalties Statute.  Included in these HHS OIG presentations are the

following:

> "These materials summarize the five main Federal fraud and abuse laws (the False Claims Act, the Anti-Kickback Statute, the Stark Law, the Exclusion Statute and the Civil Monetary Penalties Law)."

> "This booklet provides an overview of the pertinent fraud and abuse laws and is a must-read for your self-education."

> "Because you likely will treat Federal health care program beneficiaries, you need to understand these laws."

> "You do not have to intend to defraud the Government to violate the False Claims Act.  You can be punished if you act with **deliberate ignorance or reckless disregard** of the truth."
> (**Emphasis** in original.)

> "This means you cannot hide your head in the sand and avoid liability."

> "The Anti-Kickback Statute applies to both payers and recipients of kickbacks.  Just asking for or offering a kickback could violate the law."

> "Remuneration is basically anything of value."

> "The law prohibits obvious kickbacks, like cash for referrals, as well as more subtle kickbacks, like free rent, below fair market value rent, free clerical staff, or excessive compensation for medical directorships."

> "The Anti-Kickback Statute is also implicated when physicians give patients financial incentives to use their services."

" • *[Red Light]* Federal law does not prohibit you from offering free care to Medicare and Medicaid patients.  However, if you choose to waive copayments from patients but bill Medicare or Medicaid, you are not providing free care.  In some circumstances, you could be in violation of the Anti-Kickback Statute."

"The physician Self-Referral Statute, or Stark law as it is sometimes called, prohibits you from referring Medicare or Medicaid patients for designated health services to entities with which you have a financial relationship, unless an exception applies."

" • Financial relationships covered by this law include ownership/investment interests as well as compensation relationships."

"The physician Self-Referral Statute is a strict liability law, which means proof of specific intent to violate the law is not required."

"When reimbursing physicians and hospitals for services provided to program beneficiaries, th Federal Government relies on physicians to submit accurate and truthful claims information."

"The AKS is a criminal law that prohibits the knowing and willful payment of "remuneration" to induce or reward patient referrals or the generation of business involving any item or service payable by the Federal health care programs."

"The kickback prohibition applies to all sources of referrals, even patients."

| **Special Fraud Alert** | RENTAL OF SPACE IN PHYSICIAN OFFICES BY PERSONS OR ENTITIES TO WHICH PHYSICIANS REFER |

"Besides the AKS, the beneficiary inducement statute (42 U.S.C. § 1320a-7a(a)(5)) also imposes civil monetary penalties on physicians who offer remuneration to Medicare and Medicaid beneficiaries to influence them to use their services."

"What to do if you think you have a problem.  Determine what money you collected in error from your patients and from Federal health care programs and report and return overpayments."

86.     PAMC, Ltd. is fully aware that it is illegal to enter into payment or kickback arrangements with referring physicians who refer Medicare or Medicaid patients to the hospital, or to offer or pay remuneration directly to prospective patients to induce them to order or purchase services from PAMC.  PAMC is also aware that claims submitted to Medicare and Medi-Cal are required to comply with the Stark Statute and Anti-Kickback Statute, and that PAMC's truthful Cost Report certifications of compliance with the Stark Statute, the Anti-Kickback Statute and the Civil Monetary Penalties Statute are material conditions to its ability to receive and retain Medicare and Medi-Cal reimbursements.

87.     Additionally, members of PAMC's Board of Directors (Dr. Shin-Yin Wong, Dr. George Ma, Dr. Tit Li, Dr. Carl Moy, Dr. Thick Gong Chow and Dr. Stephen Kwan) are each Medicare and Medi-Cal enrolled providers, and they each signed a certification to become Medicare providers.  The certification signed by each of these individuals has a section in which each acknowledged his awareness of the Stark Statute and Anti-Kickback Statute, and agreed to abide by the Stark Statute and the Anti-Kickback Statute.  The section also acknowledges that the provider's right to receive payment from Medicare is conditioned upon the underlying transaction complying with Medicare's laws, regulations and program instructions, including the Stark Statute, the Anti-Kickback Statute and the Civil Monetary Penalties Statute. Each of the PAMC directors certified to Medicare:

> I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

CMS Form 855I, Medicare Enrollment Application - Physicians.

88.     Each PAMC director defendant also signed a Medi-Cal enrollment Application in which each physician represented that he understands that the right to participate in and receive Medi-Cal funds requires compliance with all federal laws and regulations governing and regulating Medicaid providers.  This includes compliance with the Stark Statute, the Anti-Kickback Statute and the Civil Monetary Penalties Statute.

89.     **PAMC tracks referrals and threatens to cancel arrangements if "target" number of referrals is not met.**  In exchange for the compensation set forth in these referral arrangements, each referring physician or clinic agrees to a target number of patient referrals/admissions to Pacific Alliance Medical Center each month.  PAMC diligently tracks the admissions for each of these physicians, often complete with patient names and dates of birth, and threatens to cancel the compensation arrangement if the physician's admissions fall below target.  If the physician's admissions continue to be below target, PAMC cancels the compensation arrangement.

90.     **PAMC's "Physician Integration" marketing team.**  PAMC's "Physician Integration" marketing team meets at least weekly at PAMC to review the admissions of the paid referring doctors and discuss which doctors are meeting their admissions targets and which are falling behind.  These meetings were led by PAMC Vice President of Business Development Brandon Faulk until she resigned April 29, 2013, and are also led by Vice President of Business Development Patricia Suarez, Physician Integration Manager Piper Allen, and Operations Manager Rosio Hobbs.

91.     For those paid referring doctors or clinics who are falling behind on their monthly target, the "Physician Integration" team discusses that the doctors or clinics need to be warned they are in danger of losing their compensation/remuneration arrangements ("sublease" and/or marketing payments), or that PAMC's payments will need to be reduced.  The "Physician Integration" team also discusses new leads, and how many referrals/admissions a new referring doctor or clinic represents that he/she/it can bring to the hospital, and how much money PAMC is willing to pay the doctor in a new "sublease" arrangement or marketing arrangement, based on the target referrals/admissions for that doctor.

92.     The "Physician Integration" team also discusses that each Physician Integration representative, such as Qui Tam Plaintiff Paul Chan, is required to provide a cost/benefit analysis for each newly proposed compensation arrangement (with the target number of referrals to which the doctor will commit), and that every compensation arrangement must be approved by PAMC's Vice President of Business Development, and then sent to the CEO and the Board of Directors who "sign off" on each arrangement.

93.     **Compensation arrangements for referring physicians and clinics.** PAMC targets potential high referring physicians and clinics and has five ways in which it provides remuneration to these physicians/clinics with a purpose to induce these physicians to refer/admit patients to the hospital, or refer patients to another physician to admit the patients to the hospital, or recommend that patients purchase or order facility usage and services from PAMC hospital, in violation of the Stark Statute and/or the Anti-Kickback Statute.  As described in greater detail below, these schemes include:

1.)  <u>"Sublease" arrangement to induce referral of Medicare patients</u>. Disguising payments to referring physicians in the form of a "sublease" for hosting one-hour monthly meetings with Medicare seniors (Road To

Healthy Living "RTHL" scheme), based on a target number of referrals/admissions to be made by the physicians;

2.) <u>"Sublease" arrangement to induce recommendation and referral of Medi-Cal maternity patients.</u>    Disguising payments to physicians and obstetrical clinics in the form of a "sublease" for hosting meetings and baby showers through PAMC's "MSBS" (Mama Saludable, Bebe Saludable: Healthy Mom, Healthy Baby) program for pregnant Medi-Cal women, based on a target number of delivery admissions/referrals to be made by the physicians and clinics;

3.) <u>"Shared Marketing Agreement" to induce recommendation and referral of Medi-Cal maternity patients and Medicare patients.</u>  Providing remuneration to referring physicians and obstetrical clinics in the form of a "Shared Marketing Agreement" in which PAMC pays thousands of dollars for marketing each month as a benefit to referring physicians so the referring physicians can increase their patient base and revenue.  These marketing funds paid by PAMC are based on a target number of referrals/admissions to be made by the physicians/clinics, and the referring clinic or physician matches that marketing payment amount;

4). <u>"Vendor Marketing Agreements" to induce recommendation and referral of Medi-Cal maternity patients and Medicare patients.</u>  Disguising payments to referring physicians and obstetrical clinics in the form of a "Vendor Marketing Agreement" in which PAMC pays thousands of dollars each month to market the physicians' practices to potential patients, based on a target number of referrals/admissions to be made by the physicians, without any matching amount paid by the referring clinic or physician;

5). <u>"Medical Directorships" to induce referral of Medi-Cal and Medicare patients.</u> Disguising payments to referring physicians in the form of medical directorships, based on a target number of referrals/admissions to be made

by the physicians.

94.     **1.)**   **Road To Healthy Living ("RTHL") Sublease Scheme to Induce Referral of Medicare Patients**.    In PAMC's efforts to induce referrals of Medicare patients, PAMC tells physicians who can provide a substantial volume of Medicare hospital admissions that it will sublease a small space in the physician's office for an approximately one hour "outreach" presentation to the physician's senior citizen Medicare patients each month.  PAMC's description of the RTHL program is:

> **Fee for Service Growth**
> **Seniors 65+**
>
> The program with which much success has been obtained is ***The Road to Health [sic] Living*** for seniors.  The program includes element [sic] to acquire and retain patients 65+.  The program includes:
>                                   * * * *
> ○ Sublease of space for education center (amount to be determined)

PAMC's "Strategies for Collaboration, Watts Health Corporation, Pacific Alliance Medical Center (PAMC)".

95.     This program addresses subjects like healthy living practices, high blood pressure, etc.  On average, only a few, if any, patients attend each one-hour RTHL presentation in the physician's office each month.

96.     Though the parties were not foolish enough to put the condition in writing, the "sublease" and payment amount is conditioned upon the referring physician admitting a target number of patients each month into PAMC and the agreed upon "sublease" payment amount varies among physicians, depending on the volume of patient admissions by each physician.  Depending on the physician's practice, the required admissions typically can be as low as a guaranteed five patients per month, or up to fifteen patients or more per month.  The lease rate of the one-hour "sublease" varies with the target number of patients to be admitted by the physician.

97.     Additionally, by any standard, the payment amounts for the RTHL subleases are grossly inflated.  As an illustration of how the RTHL "sublease" compensation is calculated for referring physicians, a physician who has total office space of 4,000 sq.ft. (of which 1,000 sq ft - - 1/4th or 25%- - is the waiting room), would be paid 1/4th of the referring physician's entire monthly rent, entire monthly cost of supplies and entire monthly cost of utilities for PAMC's one-hour use of the waiting room each month.  In this illustration, if the physician's rent, utilities and supplies total $8,000 per month, the one-hour sublease of the waiting room would be $2,000 each month - - for a one-hour meeting.

98.     However, the above is simply an illustration of how PAMC documents its paperwork for the amount of the one-hour "sublease."  The percentage of rent, supplies and expenses paid by PAMC to the referring physicians **is determined in a manner that takes into account the volume or value of referrals**, and always results in grossly inflated amounts for these one-hour "subleases",(violating the Stark Statute) and is made with a purpose of inducing referrals (violating the Anti-Kickback Statute).  In an April 2013 PAMC "Physician Integration" marketing discussion, PAMC Vice President of Business Development Brandon Faulk stated PAMC would pay physicians $2,000 for ten patient admissions per month.  On other occasions in "Physician Integration" marketing discussions, Mr. Chan was told that PAMC would use a 10% expense-utilization rate of the referring physician's rent, overhead and supplies for 5 - 10 patient admissions each month, 15% for 15 admissions, and 20% for 20 admissions.

99.     On other occasions, Mr. Chan was told in "Physician Integration" discussions that PAMC had set up sublease payments of $600 per month for 2 to 3 patient admissions, $1,400 per month for 10 patient admissions, and $1,600 - $1,700 per month for 10 - 15 patient admissions.

100.   In reality, PAMC negotiated the best deal it could with referring

physicians in exchange for a target number of patient referrals/admissions. However, the common denominator of each of these is the fact that PAMC's compensation arrangements were always based on, and took into consideration, the volume of patient referrals.  Business Development Department Operations Manager Rosio Hobbs is a long time employee who was also the long time right-hand person to the Vice President of Business Development, and is familiar with the details of each payment arrangement to referring physicians. Ms. Hobbs explained to *Qui Tam* Plaintiff that the hospital varies the written calculation for how much each doctor is paid, depending on the volume of referrals.

101.   Additionally, at least some referring physicians in this "sublease" program go many months without **<u>any</u>** RTHL meetings in their offices, or have **<u>never</u>** had any RTHL meeting in their office.  On information and belief, based upon Physician Integration Marketing discussions, Dr. Joseph Pierson went at least six months with no meeting occuring in his office, and Dr. Rufino Cadano had never hosted an RTHL meeting.  Yet, these physicians have received a "sublease" check of $1,697 and $2,610, respectively, every month in exchange for admitting "target" volumes of patients to the hospital.

102.   PAMC received many Medicare and Med-Cal patient referrals/admissions from physicians with prohibited compensation arrangements via the above described RTHL sublease program.  PAMC wrongfully billed government healthcare programs for its hospital services for these referred patients and received reimbursements.  Qui Tam Relator Paul Chan does not have access to these billings, but he knows that PAMC diligently tracks these referrals/admissions, the related billings, and the resulting reimbursements.

103.   **2.)   <u>Mama Saludable, Bebe Saludable: Healthy Mom, Healthy Baby ("MSBS") Sublease Scheme to Induce the Recommendation and Referral of Medi-Cal Maternity Patients</u>**.  Obstetrics/Maternity delivery. A second way PAMC violates the Stark Statute and Anti-Kickback Statute is by

compensating clinics and physicians to refer pregnant women to PAMC for the delivery of their babies.  Virtually all of these women are on Medi-Cal. In fact, as per PAMC's internal Business Development Plan for 2008, 93% of all deliveries at PAMC are paid by Medi-Cal.  This program is called the MSBS (Mama Saludable, Bebe Saludable: Healthy Mom, Healthy Baby) program.  The MSBS program sublease is very similar to the sublease for the "senior outreach" program in part 1.) above, and the payment amount **is determined in a manner that takes into account the volume or value of referrals** by each physician or clinic, and always results in grossly inflated amounts for these"subleases", (violating the Stark Statute) and is made with a purpose of inducing referrals (violating the Anti-Kickback Statute).   With the MSBS program, PAMC community relation representatives will set up a monthly baby shower or other meeting at the doctor's office.  Each baby shower or other meeting typically takes about two hours.

104.   PAMC received many Medi-Cal patient referrals/admissions from physicians with prohibited compensation arrangements via the above described MSBS sublease program.  PAMC wrongfully billed government healthcare programs for its hospital services for these referred patients and received reimbursements.  Qui Tam Relator Paul Chan does not have access to these billings, but he knows that PAMC diligently tracks these referrals/admissions, the related billings, and the resulting reimbursements.

105.   **3.)   <u>Shared Marketing Agreements ("SMA") Scheme to Induce the Recommendation and Referral of Medi-Cal Maternity Patients</u>**.  A third way in which PAMC compensates physicians for hospital referrals is via an indirect compensation arrangement in which it joins with physicians to hire a marketing firm to bring Medi-Cal covered expectant women to a physician's office or clinic.  PAMC tells obstretrics clinics and physicians who can provide a substantial volume of Medi-Cal covered expectant women as hospital admissions, that they might be able to receive the benefit of substantial marketing assistance

from PAMC.  This offer of marketing assistance is made with a purpose to induce the clinic/physician to refer the patients by either directly admitting a target number of patients to PAMC each month, or recommending to the patients that they have their babies delivered at PAMC and referring the patients to another OB (obstetrics) physician who will arrange for their deliveries at PAMC.  This arrangement whereby the clinic is induced to either admit the patients to PAMC, or recommend to the patients that they have their babies delivered at PAMC and refer the patients to OB physicians who will admit the patients to PAMC, is part of the verbal upfront agreement between PAMC and the clinic in order to enter into the marketing subsidization arrangement.  In those situations where it is determined the clinic will refer the patient to another physician for delivery, PAMC designates several OB physicians to whom the clinic physicians will refer the women for delivery at PAMC.  Thereafter, the clinic, which is in a physician-patient trusted role for these women as an influential decision maker, follows through and participates with the patients to direct them to PAMC or to an OB physician who will admit them to PAMC.

106.   Not only does PAMC take into account the volume or value of the physician's/clinic's potential referrals in its decision to offer this marketing benefit, but PAMC makes this offer of marketing assistance with a purpose of inducing the recommendations and referrals as set forth above.  The Shared Marketing Agreement is a remuneration benefit to the physician/clinic because it offers the physician/clinic the opportunity to essentially double its marketing exposure, with PAMC paying half of the cost.  This Shared Marketing Agreement thus benefits the physician/clinic by creating an opportunity for the physician/clinic to increase its patient base and bill more services to Medi-Cal and thereby earn more money.

107.   In presentations to potential referring physicians/clinics, PAMC presents its description of the benefit of the Shared Marketing arrangement as

follows:

**FFS [Fee for Service] Service Medi-Cal – Pregnant Women**

PAMC has an award winning program currently in 15 clinics.
* * * *
○ Transportaion 24/7
○ Shared Marketing Support: Up to $10,000

**In summary how does [provider/clinic] benefit from collaboration with PAMC?**
➢ Increase FFS for Medi-Cal generate more revenue for [prover/clinic]

Shared Marketing
    = More Patients!

108.   In Physician Integration meetings, Qui Tam Plaintiff Paul Chan was told by Business Development Department management that the marketers do things like hang around outside WIC Nutrition stores and other locations and pass out flyers to recruit  Medi-Cal covered expectant women to the physician/clinic. They will also provide transportation to bring patients to the physician's office/clinic.  The Shared Marketing Agreement will also pay for door hangers, radio ads and TV ads to market the physician's obstetrics clinic.  PAMC's monthly payments to marketers range from approximately $4,000 - $18,000 for each referring physician or clinic, depending on the target number of maternity patients the physician/clinic will refer for delivery.  In this Shared Marketing arrangement, the referring physician entities are supposed to also put up a matching $4,000 - $18,000 per month to pay the marketer.  Of course, PAMC's payment share of the marketing payment in this prohibited indirect compensation arrangement is always **determined in a manner that takes into account the volume or value of referrals** from the referring physician/clinic each month and is in excess of fair market value (violating the Stark Statute), and is made with a purpose of inducing referrals (violating the Anti-Kickback Statute).

109.   PAMC has received more than $100 million in Medi-Cal reimbursements for Medi-Cal patient referrals/admissions from physicians with prohibited compensation/remuneration arrangements via the above described Shared Marketing Agreement program inducement.  PAMC wrongfully billed government healthcare programs for its hospital services for these referred patients and received reimbursements.  Qui Tam Relator Paul Chan does not have access to these billings, but he knows that PAMC diligently tracks these referrals/admissions, the related billings, and the resulting reimbursements.

110.   **4.)  Vendor Marketing Agreements scheme to Induce the Recommendation and Referral of Medi-Cal Maternity Patients and Medicare Patients.**  A fourth way PAMC compensates referring physicians for hospital admissions is to directly pay a marketing firm to bring patients to a physician's office or clinic. This indirect compensation arrangement is similar to the Shared Marketing Agreements, but in the Vendor Marketing arrangement, the referring physician is not supposed to put up any matching funds.  In this marketing program, PAMC has an oral agreement with each referring physician for the amount of money to be paid by PAMC and the target number of referrals/admissions to PAMC to be made by the physician.  PAMC then enters into a written agreement with a marketer, to whom PAMC pays the amount agreed upon between PAMC and the referring physician.

111.   In Physician Integration meetings, Qui Tam Plaintiff Paul Chan was told by management that the marketers in these Vendor Marketing Arrangements do things like hang around outside the WIC Nutrition Stores, looking for Medi-Cal covered expectant women, and the Social Security office where seniors go to get their social security checks, and pass out flyers to recruit Medi-Cal and Medicare patients to the physician.  PAMC will also pay for door hangers, and other advertizing for the physician or clinic.  PAMC's payment amount is always

**is determined in a manner that takes into account the volume or value of referrals** from the referring physician/clinic each month (violating the Stark Statute), and is made with a purpose of inducing referrals (violating the Anti-Kickback Statute).

112.   One example of a Vendor Marketing Agreement involved a PAMC payment of $5,000 per month for one of its top referring Medicare doctors: Dr. Marcel Filart.  In return, Dr. Filart was supposed to admit 17 patients per month to PAMC.  In Dr. Filart's situation, PAMC paid the monthly $5,000 to a person named Samvel Kostandyna who, on information and belief, is Dr. Filart's father in law.  From Relator Paul Chan's discussions with Mr. Kostandyna and his daughter, in which they explained to Mr. Chan that they did not know how to prepare an invoice, it its believed that Mr. Kostandyna does not have any sort of marketing business and has never done any marketing for Dr. Filart.  On information and belief, the supposed Vendor Marketing Agreement for Dr. Filart is a complete sham and simply a way to funnel money to Dr. Filart in exchange for his admissions to PAMC.

113.   PAMC received many Medi-Cal and Medicare patient referrals/admissions from physicians with prohibited compensation arrangements via the above described Vendor Marketing Agreement programs.  PAMC wrongfully billed government healthcare programs for its hospital services for these referred patients and received reimbursements.  Qui Tam Relator Paul Chan does not have access to these billings, but he knows that PAMC diligently tracks these referrals/admissions, the related billings, and the resulting reimbursements.

114.   **5.)  <u>"Medical Directorships" to Induce the Recommendation and Referral of Medi-Cal and Medicare Patients.</u>**   A fifth way in which PAMC compensates physicians based upon referrals to the hospital is by awarding medical directorships to its top referring physicians, based on a target number of

referrals/admissions to be made by the physicians.  Two examples of this situation involve top referring physicians Dr. John Liu and  Dr. Marcel Filart.

115.   In addition to PAMC paying Dr. Liu $1,834 per month in a Sublease Agreement and paying an additional $4,000 per month for a Shared Marketing Agreement, PAMC compensated Dr. Liu by naming him, at various points in time, Medical Director of Acute Rehab, Medical Director of Continuity of Care, and Medical Director of PAMC's mental health wing "1 West" because of his high volume of referrals/admissions.  Qui Tam Relator Paul Chan does not know the dollar amount paid to Dr. Liu in these directorship positions.

116.   As to Dr. Filart, Qui Tam Relator Paul Chan was told by Business Development Department management that he had "$10,000 to play with" so that he could offer Dr. Filart $10,000 per month in various payment arrangements. Mr. Chan never made any compensation offer to Dr. Filart.  Mr. Chan did, however, witness PAMC Interim Vice President of Business Development Patricia Suarez tell Dr. Filart on June 5, 2013 that PAMC would name him Medical Director of Continuity of Care, but that the directorship position would require him to provide 15 - 20 referrals/admissions to PAMC each month.  Dr. Filart responded by saying "There are Stark laws." Dr. Filart also asked if Ms. Suarez would put the offer in writing.  When Ms. Suarez and Mr. Chan returned to the PAMC offices, Ms. Suarez said "*Fuck that.  I'm not putting that in writing.*"  Dr. Filart later accepted the Medical Directorship position which, on information and belief, paid him $6,000 per month.

117.   PAMC received many Medicare and Medi-Cal patient referrals/admissions from physicians with prohibited compensation arrangements and illegal remuneration arrangments via medical directorships whose compensation was made with a purpose to induce referrals, and was **determined in a manner that takes into account the volume or value of referrals**.   PAMC

1   wrongfully billed government healthcare programs for its hospital services for

2   these referred patients and received reimbursements.  Qui Tam Relator Paul Chan

3   does not have access to these billings, but he knows that PAMC diligently tracks

4   these referrals/admissions, the related billings, and the resulting reimbursements.

5       118.   **B.  Direct Remuneration to Induce Patients to Purchase Facility**

6   **Usage and Services from PAMC hospital**.  In addition to paying

7   compensation/remuneration to physicians and clinics with a purpose to have these

8   physicians refer/admit patients to the hospital or recommend or refer patients to

9   another physician for arranging to admit the patient to PAMC hospital, PAMC

10   also knowingly and wilfully offers and pays remuneration directly to prospective

11   patients to induce the patients to purchase facility usage and services from PAMC

12   hospital.  This is a violation of the Anti-Kickback Statute and the Civil Monetary

13   Penalties Statute.

14       119.   PAMC advertizes to Medi-Cal covered expectant women that they

15   will receive a free infant car seat or a baby stroller if they deliver their baby at

16   PAMC hospital.  Below are examples of how PAMC advertizes this inducement

17   remuneration:

*Free*               *Gratis*

• Car seat or stroller    • Asiento para automóvil o carreola gratis



**Regalos**

❑ **Una carreola**

    **o**

❑ **Una asiento para**
    **automóvil**

**Post Partum Upon Hospital Discharge Choice of**

❖ **Car Seat**

❖ **Stroller**

"Free Car Seat or Stroller"

"<u>Car Seat or Stroller</u>

Upon discharge the hospital will give you the option of a free gift.  You can take a car seat or stroller."

**"Patients who opt out of delivering at PAMC do not qualify for any program gift."**

| Event | Item | Distributed By: |
|-------|------|-----------------|
| Delivery at PAMC | Car Seat or Stroller | PAMC Staff |

120. **C.  <u>PAMC, Ltd. made or used a false statement material to an obligation to pay money to Medicare and Medi-Cal.</u>**   Courts have consistently held that non-compliance with the Stark Statute and/or the Anti-Kickback Statute renders claims unreimbursable.  This requirement is also statutorily mandated. 42 U.S.C. § 1395nn(g) (Stark Statute);  42 U.S.C. § 1320a-7b(g) (Anti-Kickback Statute).  The filing of a false cost report is also the filing of a false claim.

121.  PAMC, Ltd. has the ongoing obligation to return monies wrongfully received and retained from Medicare and Medicaid for billings made in violation of the Stark Statute and the Anti-Kickback Statute, and for its wrongful retention of Medicare and Medi-Cal payments as a result of its false Cost Report certifications of compliance with the Stark Statute, Anti-Kickback Statute and the Civil Monetary Penalties Statute.  The wrongfully received and retained Medicare and Medi-Cal funds are an "obligation" under the False Claims Act and the California False Claims Act.  PAMC, Ltd. has the continuing duty to repay this obligation to Medicare and Medi-Cal within the later of:

(A)   the date which is 60 days after the date on which the overpayment was identified; or

(B)   the date any corresponding cost report is due, if applicable.

42 U.S.C. § 1320a-7k(d)(2).  See also Medicare regulations 42 C.F.R. § 411.353(d); 42 U.S.C. § 1395nn(g)(2).

PAMC, Ltd. and Pacific Alliance Medical Center, Inc. identified these overpayments in each month that they occurred, and the PAMC, Ltd. cost reports for each year were due no later than May 31 of the following year.

122.   For all relevant years, PAMC, Ltd. submitted annual hospital cost reports to Medicare and Medi-Cal in which it falsely certified that its cost report is (1) truthful, i.e., that the cost information contained in the report is true and accurate; (2) correct, i.e., that PAMC is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, i.e., that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations, including the Stark Statute, Anti Kickback Statute and Civil Monetary Penalties Statute.  *Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017 (S.D. Texas 1998) (In action involving only Stark Statute and Anti-Kickback Statute allegations, Cost Report certification was held to certify compliance with Stark Statute and Anti-Kickback Statute as part of applicable instructions.)

123.   These certifications were false, for the reasons set forth in this Complaint, including the false certification of compliance with the Stark Statute, the Anti-Kickback Statute and the Civil Monetary Penalties Statute.  These certifications were, and are, material to the United States' and the State of California's decision regarding the hospital's ability to retain any Medicare, Medi-Cal and DSH funds via its Cost Report claim.

124.   By knowingly (with reckless disregard or deliberate indifference) filing false cost report certifications, PAMC, Ltd. made and used a false statement material to its obligation to repay wrongfully received and wrongfully retained money to Medicare and Medi-Cal, in violation of 31 U.S.C. § 3729(a)(1)(G) and Cal. Govt. Code § 12651(a)(7).

125.   **D.   <u>PAMC, Ltd.'s and Pacific Alliance Medical Center, Inc's improper avoidance of their joint and several obligation to repay Medicare and Medi-Cal.</u>**   As the general partner of the PAMC, Ltd. limited partnership, Pacific Alliance Medical Center, Inc. is jointly and severally liable for the obligations of PAMC, Ltd.  Cal. Corp. Code §§ 15904.04.  One such obligation is PAMC, Ltd.'s long-standing and ongoing obligation to return monies wrongfully received and retained from Medicare and Medicaid for billings made in violation of the Stark Statute and the Anti-Kickback Statute, and for its wrongful retention of Medicare and Medi-Cal payments as a result of its false Cost Report certifications of compliance with the Stark Statute, Anti-Kickback Statute and the Civil Monetary Penalties Statute.  The wrongfully received and retained Medicare and Medi-Cal funds are an "obligation" under the False Claims Act and the California False Claims Act.  PAMC, Ltd. has the continuing duty to repay this obligation to Medicare and Medi-Cal within the later of :

> (A)   the date which is 60 days after the date on which the overpayment was identified; or
>
> (B)   the date any corresponding cost report is due, if applicable.

42 U.S.C. § 1320a-7k(d)(2)..  See also 42 C.F.R. § 411.353(d); 42 U.S.C. § 1395nn(g)(2).

126.   By knowingly (with reckless disregard or deliberate indifference) and improperly avoiding this obligation to repay Medicare and Medi-Cal, PAMC, Ltd. and Pacific Alliance Medical Center, Inc. violated 31 U.S.C. § 3729(a)(1)(G) and Cal. Govt. Code § 12651(a)(7).

## XIII.  DOCUMENT EXAMPLES OF PAMC'S VIOLATIONS.

127.   Below are examples of how PAMC's direct and indirect compensation arrangements take into consideration the volume of Medicare and Medi-Cal patient referrals.

128.   **A.  Marketing Notes Documenting How PAMC's Compensation Arrangements Take Into Consideration the Volume of Referrals**.  PAMC "Physician Integration" representatives are required to log notes of their communications with their referring physician accounts into PAMC's Microsoft Access database system.  Excerpt verbatim examples of these notes, reflecting the fact that PAMC's "sublease" payments to referring physicians and PAMC's Marketing Agreement payments for referring physicians take into consideration the volume of referring physicians' admissions to Pacific Alliance Medical Center hospital include:

**Gioconda Rodriguez (Director of Physician Integration) Access call notes.**
Dr. Vincent Anthony
5/3/2010  "Met with Dr. Anthony. His app should be ready this week. He wants to get on staff… We can assist him w SNFs. He can help us fill the bag"

7/15/2010 "Met with provider. Established we will check in two weeks… he wants to expand SNF, RTHL and do hospital work for any referring accnts we introduce him too. He can commit to about 5 admits/month. Will take Joanne M to meet with him in the next 2 weeks (Dr. V. Anthony's name came up during her SNF rounds)."

1/21/2011 "This doctor may be someone Karen helps market and we may be able to see 5-10 admits per month."

Dr. Paul Baylon
8/2/2010 "Dropped off med staff app… Jessica will help me complete app… GR to check in wk of 08/09… perhaps I can take M. Roman so they can meet. Will need to set up another mtg with Baylon to discuss SMA again and his commitment level. We will do SMA once his app is approved with Med Staff… until then we can quanitify his true numbers."

Complete Care
6/28/2010 "Met with Martha, mkt vendor and Yuri. Contract signed and submitted to RZ. They have 13 dels/mo. Goals established. All is good."

Clinica Del Socorro
11/5/2010 "Per Roxanne at the clinic, they have referred about 4 or 5 pts… I told her to give me the names so I can start tracking. Dr. Wang will be their hospitalist… I told them we need a couple pts a week (med surge). They are also interested in building their OB but that will be long term… they still need to get CPSP and other things organized. However, I told them to send Med Surge and once we have a track record, then we can tailor a program for the Senior business. Will drop by next week to deliver flyers and physician order forms."

11/10/2010 "Dropped off physician order forms, transportation flyers and goodies to them. Introduced them to Wang (conference call) and met their PA, Jesse. They will refer as many pts as possible… I gave them their target 5+ per month, consistently. Will monitor over the next 2-3 months."

12/3/2010 "One admission so far this month; the deal is they will refer to Wang, when they reach at least 5 admits per month we will tailor RTHL program for clinic."

Dr. Daneshgar
7/21/2010 "Met with physician… he said Salceda spoke with him about working with PAMC… he is not interested at this time… but will keep us in mind… I pitched the idea of SMA and send deliveries to Salceda. He will call me though if anything should change."

Dr. Maged Faragalla
4/21/2010 "Met with Dr. F. GR dropped off sublease check. Discussed admissions."

5/25/2010 "Supposed to meet with Faragalla Weds at Mednik office. Supposed to get letter signed by MD re cancelling SMA."

5/26/2010 "Met with Dr. Faragalla, signed cancellation letter. RE: Washington clinic, he is waiting to speak with MR or BF re support at clinic, he is ready to sign lease. He asked about other clinics he can take over.. Think BF mentioned it to him. I also spoke with him admissions; told him he needs 5 every month. Told him no events in ELA or HP we rather do something in Hawthorne. He already got permit to do events. M. Roman can f/u."

6/9/2010 "Delv sublease ck to Faragalla. He said he is having health fair in two wkds wants Martha R to call him re details. Also talked to him about admissions… told him he only had couple in May and really need his support right now."

7/13/2010 "Met with MD to discuss sublease, and volume @ Aghapy. Told him we are terminating Sublease. And that numbers at Aghapy need improvement or else we may have to terminate that contract too. He suggested we meet Mon morning at his office. Will run it by M. Rivera and invite M Roman to attend."

7/27/2010 "Dropped off sublease… he had another pt this week for Med Surge… he wants to re-instate sublease… he says he will send us pts. He has send 3 pts since the letter. Also, spoke to him about OB volume. He asked about the retention person… he is open to any changes."
8/8/2010 "He sent another admission to us this week… per M. Rivera if he continued the trend of sending us pts weekly (which he has… I will track number and submit to RZ) we would cancel the cancellation letter. I need an update on this strategy."

8/25/2010 "Dr. Faragalla sent another admission this week… any chance we will be able to reinstate the sublease? Even if it is at a reduced rate?"

10/28/2010 "Met with Faragalla re admissions… he said he will try to send more patients but wants to know if we will restart the sublease? I told him (per BEF last msg) if he admits 5+ consistently for 2-3 months we would do new sublease. He also mentioned some concerns re Sylvia in HP."

Dr. Marcel Filart
5/3/2010 "Visited and met with Dr. He knows my goal for him is 20… Also discussed with him the two candidates for Phys Guarantee. Presented him with the Cvs. MY helping me set up interview."

5/6/2010 "Spk w Md re interview next week with new provider and admissions."

7/27/2010 "Met with MD Fri, took KP and JM to his office. All is ok.. He mentioned some frustation with EHS… but he is handling it himself. All is ok… text him this morning re admissions. His mtg is about 12… we need 5 from him this week."

11/5/2010 "Meeting with BEF and Filart went well. He recommitted to 20 admits per month. We will ride the wave until Yan and Filart settle their agreement."

2/11/2011 "Met with MD… discussed volume and goal (18). He gave me names for this month… he is about 10."

Dr. Gwen Flagg
5/14/2010 "Delivered sublease check on Fri. Discussed with Lorena admissions. Told her we need to get to 7 in the next couple months. We will do flyers with clinic info to bring more awareness of PMAC to her pts."

6/9/2010 "Delv sublease ck. Talk to them re admissions. It looks better… 3 mtd."

12/14/2010 "Delivered gift. Discussed admissions. Spoke with Lorena and Dr. flagg seperately."

11/9/2010 "Dropped off sublease check. Checked in re admissions. They will send. Last month they had 6. They continue to push to send pts. There are a lot of pts that are new to practice that still want to go to Centinela (mostly the african american pts); she tries really hard to convince them to come to PAMC (we have seen an increase of those new pts to PAMC). I suggest we use the RTHL class in December to market to those seniors… maybe raffle Turkeys too and have gifts for them (the gifts with our logo). Are we feeding them? I think we should; this is a good opportunity to market those seniors. In the past I told Lorena that I want her to get to at least 6-7 pts consistently a month… that is just a couple more pts she can convince to come to PAMC that go to Centinela… she is trying. Maybe we can do the medicine bags with their info as well as PAMC info. Perhaps for next year. I think there is an opportunity with that population."

12/5/2010 "Dropped off sublease check for Dec. They will try to send pts; Lorena knows the commitment to us. She said they have been slow."

Dr. Cadrin Gill
4/22/2010 "Met with Gill. Dropped off sublease, consolidated April admissions."

7/26/2010 "Picked up contract and submitted to M Roman. All is good… he has about 5 pts mtd… he will push for more during the week."

9/10/2010 "Met with Gill, went over admissions… he is going on vacation from 09/11 until 09/19. Will check in couple weeks. Dropped off sublease check."

6/1/2010 "Met with MD, went over admission. MD met his goal for the month of May."

1/12/2011 "Delivered sublease check… talked to him re admissions."

11/2/2010 "Met with Dr. Gill… consolidated admissions for month of Oct. He says he should have more… but they were not on the list. He is going to get a list from the SNFs and let me know next week when I deliver sublease check."

11/9/2010 "Met with Gill and Eleanor re volume. He still committed. He said we should see volume pick up soon. In fact, Eleanor will call his SNFs to remind them to call PAMC for admissions."

Dr. Nijole Glaze
7/30/2010 "Met with Glaze re changing physicians from King to Liao… we will monitor the next 2 weeks to see how pts respond. They continue to be supporters of PAMC… I reminded both Dr. Glaze and Monica (manager) of the goal and asked them to push for 2 or 3 more pts a month, as they are requesting assistance from us for their newly opened location in LA."

1/20/2011 "Visited Dr. Glaze re Dr. Liao issue… all is good. Glaze did bring up that they have increase marketing efforts resulting in about 40 new Obs… we should get to at least 15 dels per month… once they do.. We will increase mrkt… until then can we have an open PO with them for $200 per month?"

8/19/2010 "Jim was here at office, was able to briefly discuss increasing OB volume at their site in Lynwood. The avg is about 9 dels, targeted goal is 10… I am asking him to push for 13 dels. He said he will speak with his staff."

11/3/2010 "Spoke with Jim re OB marketing. He said they are putting additional resources to increase volume… they want to know if we are open to increasing marketing. They plan on increasing from 80-> 120 new

patients, that will be at least another 5 deliveries per month. He said if we get 15/month how much can we increase??"

11/10/2010 "Spoke with Mroman re Dr. King possibly being the OB MD. We need BEF blessings. Per BEF last week, if they increase to 15 we will increase SMA… having King with them, may do the trick."

Dr. Alberto Jimeno
5/18/2010 "Met with Dr. Jimeno. They are very slow now. He is only admitting couple pts a month. And his SNF business has decreased dramatically. Not worth pursuin. Denise the manager wants us to help with the RTHL. However it is not worth it for us."

Dr. Anil Mohin
2/17/2011 "Met with MD and Francisco, discussed clinic volume, etc. They know our expectations in terms of volume and allocation of resources. For now put on hold."

6/15/2011 "Gave Francisco the sublease data sheet to complete so we can initiate sublease contract. Took Ilian to meet with Dr. Mohin and Francisco to get things situated with RHTL and the call center."

Dr. Naim
6/9/2010 "Spk with Dr. Naim, he is committing to 20-30 dels; he does about 50 total bw his three clinics…. He will refer to Salceda… He is looking for SMA… Need a budget… at least 6k…"

6/30/2010 "CV…  delvd contract. Dr. Naim still thinking about it. Will touch base end of week or early next week."

Dr. Hy Phung Ngo
11/3/2010 "Met with Ngo, he signed sublease contract. Also dropped off Juan Lepe's contract. Discussed volume with him."

11/11/2010  "Met with Ngo re Mitchell and SNF business, Wong and White Memorial, EDS and volume, overall volume, target admissions monthly and his overall commitment to PAMC… He is not going to Silverlake btw, focusing on MP, White, and PAMC. He is giving all SNFs to Mitchell. He conferenced call to set up mtg with us and her and to get commitment from her… he told her at least 5 admits per month. He committed to 15 total. Asked to give him until April 2011 to revise contract. As for DR. Wong, he is salary guarantee but is under Ngo and Ngo is going to bring him on as a partner bc they have really hit it off. That's the reason he wants us to hold on revising contract, he says he finally has a good foundation with his providers, bw Wong and Margaret, the NP. He feels strongly about his direction and wants to continue to be a strong partner. He definitely committed to 15."

11/22/2010 "Dropped off sublease checks, through out week have texted re admissions."

12/2/2010 "Dropped off contract and sublease check… discussed volume with Ngo. Still slow. Did help EDS with 2 admits and assisted Mitchell with admit from SNF"

2/11/2011 "Met with MD… He can commit to 15 per month… he wants assistance with new clinic- Dr. DF. Told him about physician Mixer."

Dr. Pickett
1/13/2011 "Met with MD… He is open to the sublease contract with our own Ed classes through Ana E. We spoke re the targeted goal… he believe 10 per month to start is achievable. He was very complimentary about PAMC; said the facility if very nice."

9/16/2010 "Met with Pickett… discussed SMA… he proposed a diff type of marketing. He can commit to 10-15 per month, as we align more than we are shooting for 20… he understands about our goals and I explained our planning strategies for next year and that we want to include him and work with him. He mentioned Care1st contract… that he will be assigned new OB pts from them… potentially 20-30 deliveries from those assignments."

Dr. Howard Ragland
8/5/2010 "Spk with his Corina his manager to discuss the Med Staff issue… she is assisting us… also she inquired about marketing… I told her to keep pushing as many deliveries and explained the same I explained to Ragland… about 3k for SMA, goal of 10-12 dels per month. This goal is attainable."

6/29/210 "Also talked about SMA… encouraged him and urged him to send all deliveries to PAMC. He has agreed"

Dr. Samonte
1/11/2011 "Met with MD and Karen and BEF. Great meeting. We will move forward with marketing contract with Karen as well as Longwood assignments for now. He is putting on hold the lease with Dr. Chu. He admitted one pt this week and received one from GeriCare. Goal is 10 per month with room to grow to 15."

12/3/2010 "Met with Samonte and Karen, have to work on ambulance referrals, refer admits to Samonte; he said he can admit at least 15 admit per month."

Dr. Tomas Sevilla
4/27/2010 "Called Sevilla re admissions, sublease. We are scheduled to meet for lunch on Fri, 04/30/2010 at 2pm."

5/20/2010 "RTHL classes in questions for month of June. Await Martha and PS assessment."

5/26/2010 "Spoke with Dr. Sevilla… he wants to do an event… I will press for 5 admissions… see what I can do. Not promising anything to him though."

7/7/2010 "Sevilla called. Spk to him briefly about admits/RTHL events. Same as last month.  We need to see at least 5 admits per month to do RTHL events moving forward."

Dr. Cesar Velez
5/6/2010 "Delv contract, thank them for the admissions mtd"

5/19/2010 "Per M. Rivera leave Med Staff issues alone… continue to encourage Admissions… will let the dust settle for now…. I will remind Velez that we have sublease and need his support."

6/1/2010 "Dropped off sublease check. Velez said all is fine. He reached his goal for the month of May."

12/7/2010 "Delivered sublease check. Second sublease is pending, he asked me about it. Velez continues to support us with admits."

Dr. Yan
11/11/2010 "GR stopped by to drop off phys order forms, transportation and important numbers for the hospital. Briefly inserviced his staff. Met with Freddie and told him black and white that we need to double our efforts since we are doubling resources. He knows Filart was only sending us about 15 pts… so I told him we need 30… I think we will see for sure 25 pts per month. The rest of the month we may see a peek since Filart will be out of town and Yan will be handling everything. Freddie said they will send everything to us. Freddie also said that the deal is going through and that it benefits Filart to do this."

2/15/2011 "Dropped off Jan check.  Also we discussed the deal w Filart, SNF assignments, and admisisons volume. Also set the meeting with JE, BEF and Yan."

**Piper Allen (Physician Integration Manager) Access call notes.**
Dr. Jeremiah Aguolu
4/28/2010 "Dropped off flyers, Dr. happy with production, will have staff start using and also passing out to patients. Discussed patient admissions

and we should start seeing them come our way ASAP, said he wills tart sending through Dr. Liu (gave him his contact numbers), also gave him staff list for complete list of specialist, agreed to bring back flowchart, admissions and x-ray forms. Look into appointment cards, will"

5/20/2010 "Texted that we still have not seen patients and are awaiting them."

5/25/2010 "Went by to find out if they truly have patients to send or not and that we have shown good faith through providing flyers. Spoke with his son who helps run the clinic.."

Dr. Mahesh Bhuta
3/1/2011 "Met with Dr. Bhuta and he is fine with proposed 1 referral for 1 local SNF patient relationship with PAMC."

Dr. Felipe Chu
4/21/2010 "Met with Dr., goes to multiple snf which includes  is own Sunrise (99patients) Looking to expand snf base and increase senior base in clinic. Wants to come on staff. Will take application and discuss expectations of admissions."

4/29/2010 "Spoke with Donna, Will go Monday to take staff application and discuss strategy with Dr. Chu (RTHL)(SNF program)(Discuss admission goals)"

Dr. Steven Clark
5/18/2010 "Visited; Per S. Thomas shared the door hanger. Frankly discussed commitment for support from PAMC. Need to see good faith before any help.  Will ask if we can start with 200 flyers for waiting room. Asked for 3-5 patients for good faith."

6/22/2010 "Met to discuss admissions and expectations. He knows also Pickett, Maxey and many docs I am working with. He will start bringing most surgeries and his current patients call 911 and are admitted mostly from home, we agreed to get a poster forwaiting room and flyers for patients to take hom and start knowing to call us when they need to be admitted. He will work on his surgeries and admissions."

Dr. Stephen Copen
4/23/2010 "Physician Busy with patients, dropped off Staff Application. Will do a follow up visit to discuss coming aboard, schedule to take Martha back to discuss RTHL program. To discuss admission goals/expectations"

Dr. Cadrin Gill
4/22/2010 "Met with Gill. Dropped off sublease, consolidated April admissions."

6/1/2010 "Met with MD, went over admission. MD met his goal for the month of May."

7/26/2010 "Picked up contract and submitted to M Roman. All is good… he has about 5 pts mtd… he will push for more during the week."

9/10/2010 "Met with Gill, went over admissions… he is going on vacation from 09/11 until 09/19. Will check in couple weeks. Dropped off sublease check."

11/2/2010 "Met with Dr. Gill… consolidated admissions for month of Oct. He says he should have more… but they were not on the list. He is going to get a list from the SNFs and let me know next week when I deliver sublease check."

11/9/2010 "Met with Gill and Eleanor re volume. He still committed. He said we should see volume pick up soon. In fact, Eleanor will call his SNFs to remind them to call PAMC for admissions."

1/12/2011 "Delivered sublease check… talked to him re admissions."
6/11/2012 "Met with Dr. Gill, he gave me his list of SNF patients, will review with Brandon and Michael.  He wants an ETA on the RTHL education program (Topics and dates0 Very important for him. He is working to start sending more patuients our way."

4/22/2013 "Met with Dr. Gill, just before arriving found out he is now in the EHS system, LA and valley clinic, Melli is his rep. HC Partners was visiting the same time I was. He is going to try HC Partners and EHS at the same time to see who responds the best. Encouraged him to consolidate his IPA usage. Re-iterated Brandon's message of using EHS and possibly getting sublease re-instated."

Dr. Michael Guice
3/3/2011 "Met with Dr. Guice and he is interested in sub-lease with PAMC. Would be able to direct 5 admits per mo."

Dr. Michael D. Hamilton
4/26/2013 "Encouraged him to be open minded at working with us on opportunity (RTHL), maybe sublease (need to vet more) just joined EHS."

Dr. Lemmon McMillan
11/15/2012 "Met with McMillan and Digna to get contract signed, talk about admissions. Digna has started having (Claudia) back office use our admission log to keep trak of who Soliman and Daniels are sending to the hospital. I will be checkin in weekly."

11/29/2011 "Went to deliver contract, Digna gone, check with Claudia about admissons and using the log. No admissions yet .. Will follow up next week."

12/4/2012 "Met with McMillan to sign Hippa clause, gave him his copy. Assured him that he would receive sublease check soon for both Nov and Dec.., I will also have Ilian touch basis with Digna about specifics of their RTHL program."

Dr. Malvin Yan
5/11/2012 "Met with Yan to fu from meeting with Gitter and Pesheski. Assured himof the benefits from working with Gitter's group and the support he will continue to receive from both PAMC and now Gitter's group. I addressed the offer of $90 Medi and $130 Medi Medi from Gitter. Yan wanted $150 but ok'd to settle with $135 only after I tried to ask for $140 for him. I addressed he must send admits to us first, not transferred to be counted as his monthly admissions. He wants me to come back with answer next week."

129.   **B.  Partial List of Physicians and Clinics with Compensation Arrangements in Which the Payment Amounts Take Into Consideration the Volume of Referrals/Admissions, and are Made with a Purpose to Induce Referrals**.  Relator Paul Chan does not have access to many of PAMC's records. However, from the records to which the Relator did have access, and from discussions that took place in the Physician Integration Marketing meetings, Mr. Chan is aware of a partial list of physicians and clinics with compensation arrangements at various points in the time frame of between 2007 and 2013 in which PAMC's payment amounts were based on, or took into consideration, the volume of referrals/admissions.  From Physician Integration marketing discussions, Mr. Chan knows that PAMC diligently tracks each compensation arrangement and each particular physician's related  referrals/admissions, and has

the full details of these arrangements, referrals/admissions, patient information and each related Medicare and Medi-Cal claim submitted and the corresponding Medicare, Medi-Cal and DSH reimbursements.  The list and information to which Mr. Chan had access in his normal job function is as follows:

| Physician/Clinic | Compensation Arrangement | PAMC's  Payment |
| --- | --- | --- |
| Dr. Ali Abaian | Marketing Agreement | $4,000/month |
| Dr. Peyman Banooni | Sublease Agreement | $2,253/month (PAMC cut Dr. Banooni's sublease amount because of his low admissions) |
| Dr. Rufino Cadano | Sublease Agreement | $2,610/month (even though Dr. Cadano never hosted any event) |
| Dr. Lulu Chen | Sublease Agreement Marketing Agreement | $1,913/month $3,000/month |
| Dr. Paul Chu | Sublease Agreement | $2,501/month |
| Dr. S. Paul Daniels (Health & Wellness MedicalClinic) | Sublease Agreement | $2,240/month |
| Dr. Maged Faragalla | Marketing Agreement | $5,000/month |
| Dr. Marcel Filart | Marketing Agreement Medical Directorship | $5,000/month $6,000/month |
| Dr. Byron Flores | Sublease Agreement | $2,225/month |
| Dr. Cadrin Gill | Sublease Agreement | $3,401/month (after more than five years, PAMC cancelled the sublease because of Dr. Gill's low admissions) |
| Dr. Enriqui Gonzalez | Marketing Agreement | $2,500/month (PAMC cut Dr. Gonzalez's Marketing Agreement amount in April 2013 because of his low admissions) |

| Physician/Clinic | Compensation Arrangement | PAMC's Payment |
|---|---|---|
| Dr. Joseph Kang (California Grace Medical Clinic) | Marketing Agreement | $2,500/month |
| Dr. John Liu | Sublease Agreement Marketing Agreement Medical Directorships | $1,834/month $4,000/month unknown dollar amount per month |
| Dr. Lemmon McMillan | Sublease Agreement | $1,182/month |
| Dr. Anil Mohin | Sublease Agreement | $2,014/month |
| Dr. Hy Ngo | Sublease Agreement | $2,445/month |
| Dr. Victor Pedroza | Sublease Agreement | $2,054/month (PAMC eventually cancelled sublease because of Dr. Pedroza's low admissions) |
| Dr. David Pezeshki (Centro Medico) | Sublease Agreement Marketing Agreement | $4,051/month sublease and $5,000/month marketing. (PAMC eventually cut its payments to Dr. Pezeshki because of his low admissions) |
| Dr. Anthony Pickett | Sublease Agreement | $3,055/month |
| Dr. Joseph Pierson | Sublease Agreement | $1,697/month (even though Dr. Pierson went at least six months without ever hosting an event at his office) |
| Dr. Maria Rodriguez | Sublease Agreement | $1,323/month |
| Dr. Tomas Sevilla | Shared Marketing Agreement for Seniors | $3,000/month |
| Dr. Kevin Thomas | Sublease Agreement | $1,400/month |
| Dr. Cesar Velez | Sublease Agreement | $1,667/month |
| Dr. Cesar Velez (Sunset Clinic) | Sublease Agreement | $1,147/month |
| Dr. Malvin Yan | Marketing Agreement | $5,000/month |
| Dr. Shuo Steven Wang | Sublease Agreement Medical Directorship | $969/month unknown amount/month |

Plaintiff's Third Amended Complaint

| Physician/Clinic | Compensation Arrangement | PAMC's Payment |
|---|---|---|
| Cardinal Medical Group | Marketing Agreement | $5,000/month |
| Century Women Medical Clinic | Marketing Agreement | $7,000/month |
| Clinica Medica Latina | Marketing Agreement | $4,000/month |
| Clinica Santa Maria | Marketing Agreement | $12,000/month (but PAMC reduced to $9,000/month in 2009 because of low admissions) |
| El Monte Community Clinic | Marketing Agreement | $5,000/month |
| GC Medical/First Street | Marketing Agreement | $6,000/month |
| Isabel Women Medical Clinic | Marketing Agreement | $4,000/month |
| La Maternidad | Marketing Agreement | $5,000/month |
| La Salud Medical Clinic | Marketing Agreement | $10,000/month |
| Lincoln Heights Family and Independent Medical Group, Inc. | Marketing Agreement | $5,000/month (but PAMC later reduced to $4,000/month because of low admissions) |
| Los Angeles Medical Center | Marketing Agreement | $10,000/month (but PAMC increased to $15,000/month because of high admissions) |
| Nueva Esperanza Medical Clinic | Marketing Agreement | $4,000/month |
| Santa Teresita Medical Clinic | Sublease Agreement | $1,446/month |
| Town Center Medical Group | Marketing Agreement | $5,000/month |

130.   **C.  PAMC Internal Analyses Tying Compensation Arrangements to Volume of Referrals**.  PAMC constantly tracks how much it is paying physicians in compensation arrangements, and the corresponding volume of

referrals it is receiving from those physicians.  Examples of PAMC's analyses of this include the following.

131.   According to PAMC's Executive Summary Business Development Plan 2008, Medi-Cal pays for 93% of all maternity deliveries at PAMC.  Below are excerpts from an analysis that was part of PAMC's "PAMC OB Summit, April 20, 2009, examining the cost/benefit of PAMC expenditures for OB referrers :

**Projected Year End Forecast:**

| Clinic | Volume Goal | Volume Actual | Variance | Rating | Expenditure (in Thousands) |
|---|---|---|---|---|---|
| Abaian | 108 | 108 | 0 | Grinner | $8 |
| CA Grace | 120 | 120 | 0 | Winner | $5 |
| Cardinal | 150 | 120 | -30 | TDB [sic] | $10 (Effective May) |
| Maternidad | 144 | 162 | 18 | Grinner | $10 - $12 (Effective May) |
| St. EP | 150 | 144 | -6 | | 24 (both clinics) |
| St. HP | 210 | 144 | -66 | | |
| Lincoln Hts. | 120 | 162 | 42 | Winner | $10 |
| Faragala | 144 | 156 | 12 | | $10 - $12 (Effective May) |
| La Salud | 210 | 120 | -90 | | $20 |
| Glaze | 120 | 120 | 0 | | $8 |
| PAMC Clinics | 360 | 330 | -30 | | $22 |
| **Sub-Total** | **1836** | **1686** | **-150** | | |
| Walk-Ins | | 240 | 240 | | |
| **Total** | **1836** | **1926** | **90** | | |

**Clinics that may be cut, dependent upon productivity:**

| Clinic | Volume Monthly | Volume Annually | Expenditure Monthly (in thousands) | Expenditure Annually (in thousands) |
|---|---|---|---|---|
| Abaian | 9 | 108 | $4 | $48 |
| St. Marias | 24 | 288 | $12 | $144 |

**Conclusions:**

\* \* \* \*

2.  Over-spending in relation to results

\* \* \* \*

4.  Too many mediocre performers

132.   Excerpt from PAMC's "**Executive Summary Business Development Plan 2008**":

Goal 1:      Increase Medi-Cal patient base at PAMC through the expansion of Obstetrical Services

**2008 IMPERATIVE**

\* \* \* \*

•  Ensure each clinic is held to expected standard related to productivity....

Tactics:

\* \* \* \*

4. Continue shared marketing with select and productive clinics.

\* \* \* \*

6.  Institute a "clinic monitoring program" that tracks new OB patients, patient retention and internal data.

133.   Excerpts from PAMC's **Pacific Alliance Medical Center Audit Review Form - First Quarter 2008**:

Date: April 21, 2008
Site Reviewed: Century
Contract Amount: $14,000.00 Monthly

Volume

| Jan | 40 |
|-----|-----|
| Feb | 52 |
| Mar | 53 |

Date: April 21, 2008
Site Reviewed: La Maternidad
Contract Amount: $10,000.00 Monthly

Volume

| Jan | 50 |
|-----|-----|
| Feb | 36 |
| Mar | 44 |

Date: April 21, 2008
Site Reviewed: LAMC
Contract Amount: $20,000.00 Monthly (Jan)    $30,000 Monthly (Feb Mar)

Volume

| Jan | 122 |
|-----|-----|
| Feb | 90 |
| Mar | 121 |

Date: April 21, 2008
Site Reviewed: Santa Maria Echo Park - Huntington Park
Contract Amount: $28,000.00 Monthly

Volume Echo Park

| Jan | 36 |
|-----|----|
| Feb | 28 |
| Mar | 34 |

Volume Huntington Park

| Jan | 83 |
|-----|----|
| Feb | 78 |
| Mar | 53 |

///

///

///

///

///

///

///

///

134.   Excerpt of Preliminary Provider Report, Year 2007:

## PRELIMINARY PROVIDER REPORT

| | Monthly $ | Yearly $ | Annual Activity | | Monthly Activity Avg. | | Rank | $ / Admit | Rank - ROI |
| | | | 2006 | 2007 Annualized | 2006 | 2007 | | | |
|---|---|---|---|---|---|---|---|---|---|
| Liu SM $4K & sublease $1834 (incl. wound & med/surg) | $5,834 | $70,008 | 247 | 80 | 21 | 7 | * Combined below | $875 | |
| Chen | $1,956 | $23,472 | 69 | 195 | 6 | 16 | | $120 | |
| Axis Medical Group (incl. wound & med/surg) | | | 141 | 92 | 12 | 8 | Slug | $0 | |
| Daniels (incl. wound & med/surg) | $2,240 | $26,880 | 101 | 148 | 8 | 12 | Winner | $182 | Winner |
| Ngo | $1,580 | $18,964 | 64 | 88 | 5 | 7 | Slug | $216 | Winner |
| Velez 2 clinics | $2,814 | $33,768 | 134 | 132 | 11 | 11 | Grinner | $256 | Winner |
| Liu / Chen | $7,790 | $93,480 | 316 | 275 | 27 | 23 | Winner | $340 | Grinner |
| Flores | $2,225 | $26,700 | 68 | 78 | 6 | 7 | Slug | $342 | Grinner |
| Filart (using 10 months for avg) | $5,000 | $60,000 | 0 | 140 | 0 | 14 | Winner | $429 | Slug |
| Gill (incl. wound & med/surg) | $3,481 | $41,772 | 45 | 97 | 4 | 8 | Slug | $431 | Slug |
| Sevilla (SM & sublease) (incl. wound & med/surg) | $2,946 | $35,352 | 67 | 57 | 6 | 5 | Slug | $620 | Sinner |

**Rank / Activity**

Winners: ≥12

Grinners: 9-11

Slugs: 6-8

Sinners: ≤5

**Rank / $ per Admit**

Winners: ≤300

Grinners: $301 - $400

Slugs: $401 - $450

Sinners: ≥$451

///

///

135.   "**Medical Surgical Accounts**" report, copied below, and plainly showing how it is PAMC's obvious wide-spread business model to pay referring physicians for referrals as follows:

| MEDICAL SURGICAL ACCOUNTS | |
|---|---|
| **Winners** | |
| Dr. Daniels: 12/182* | A Winner all the way around. Cooperative and loyal to PAMC. **Terrific volume and ROI**. |
| Dr. Filart: 14/429* | Volume is terrific, but current **ROI is at Slug level**. However, volume is expected to increase significantly, ranking him as a Winner. |
| Drs. Liu & Chen 23/340* | Using only direct admit numbers for evaluation. Winners with respect to volume, but **ROI places them at Grinner level**; however UR issues impact negatively on overall performance. Nevertheless, consider them Winners when loyalty to PAMC is included in the equation. |
| **Grinners** | |
| Dr. Flores: 7/342* | His volume is at Slug level, but his **ROI is at Grinner level**. He maintains consistent performance in spite of severe practice challenges. Consider him a Grinner when all is considered. |
| Dr. Ngo: 7/342* | Using only direct admit numbers for evaluation. Volume is at Slug level, but **ROI is at Winner level**. Annualized 2007 volume shows an increase from 2006 and April was a great month for him with 10 direct admits. Consider him a Grinner. |
| Dr. Velez: 11/256* | At present, volume is at Grinner level, but his **ROI is at Winner level**. A Grinner heading for Winner. |
| **Slugs** | |
| Axis Medical Group: 8* | Volume has decreased relative to 2006 in spite of HBO activity. |
| Dr. Gill: 8/431* | A **Slug at present both in volume and ROI**. Although volume has been erratic, his 2007 projections are double 2006 activity. However, March was a terrific month, at 15 admits, with Dr. Liu diligently following convalescent home patients. Sustained support of Dr. Liu following Dr. Gill's convalescent home patients should see volumes sustained at March levels (15). **Recommend two months to determine if contract amendment is indicated**. |
| **Sinners** | |
| Dr. Sevilla | Volume is low. Relationship needs strengthening if account is to thrive. **Inclined amend the contract**, but before taking that step will discuss situation with physician. Splitting with White? Practice issues? |
| * Average Admit per Month / Business Development Cost per Admit (See attached for detail) | |

(**emphasis** added.)

## XIV. <u>False and Fraudulent Claims and Statements</u>

136.   The physicians and clinics with whom PAMC entered into financial and remuneration relationships as set forth above referred, recommended and/or admitted  patients to PAMC for designated health services, including Medicare and Medicaid patients, in violation of the Stark Statute and the Anti-Kickback Statute and the Civil Monetary Penalties Statute.  Additionally, PAMC offered and paid remuneration directly to prospective patients to induce the patients to purchase facility usage and services from PAMC hospital.

137.   PAMC, in turn, knowingly presented, through the fiscal intermediary and MAC, claims for payment to the Medicare program for designated health services provided for these resulting patient admissions.

138.   PAMC also knowingly presented,through the State of California's Medicaid program, claims for payment to the Medicaid program for designated health services provided for these resulting patient admissions.

139.   PAMC was not entitled to payment for these claims and, as a result, the submission of these claims was the submission of false claims in violation of the False Claims Act and the California False Claims Act.  PAMC's submission of these false claims to Medi-Cal also caused the State of California to submit false claims to the United States for the federal portion of the Medicaid funds that were paid to California for PAMC's false Medi-Cal claims.  PAMC thereby obtained payments from the United States and the State of California in violation of the Stark Statute, the Anti-Kickback Statute, the False Claims Act and the California False Claims Act, and caused the State of California to submit false claims to the United States.

140.   Under the False Claims Act, 31 U.S.C. § 3729(a)(1) and (a)(1)(A) and Cal. Govt. Code § 12651(a)(1), the claims resulting from these prohibited financial and remuneration relationships were false because PAMC was prohibited by the Stark Statute, the Anti-Kickback Statute from obtaining payment from the United

States and the State of California upon claims for designated health services provided for the prohibited referrals and admissions.

141. PAMC also violated the False Claims Act, 31 U.S.C. § 3729(a)(2) and (a)(1)(B) and Cal. Govt. Code § 12651(a)(2), by knowingly making false statements to the fiscal intermediary and MAC and to the State of California, to get claims paid by Medicare and Medi-Cal for designated health services provided for the prohibited referrals and patient admissions.

142. PAMC's certifications that its cost reports were "true and correct" and "in accordance with applicable instructions" (including the Stark Statute, Anti-Kickback Statute and the Civil Monetary Penalties Statute), were knowingly false because PAMC acted with at least reckless disregard or deliberate indifference as to its certification of compliance with the Stark Statute, Anti-Kickback Statute and/or the Civil Monetary Penalties Statute.

143. Via its Cost Reports, PAMC also violated the False Claims Act, 31 U.S.C. 3729(a)(7) and and (a)(1)(G) and Cal. Govt. Code § 12651(a)(7), by knowingly making or using false records and statements to conceal, avoid or decrease PAMC's obligation to pay or transmit money to the United States and to the State of California (i.e., to avoid refunding wrongful payments received in violation of the Stark Statute and the Anti-Kickback Statute) by claiming payment for which it was not entitled, and by falsely certifying that its cost reports were "true and correct" and "in accordance with applicable instructions" (including the Stark Statute, Anti-Kickback Statute and the Civil Monetary Penalties Statute), all in violation of the False Claims Act, 31 U.S.C. § 3729(a)(7) and (a)(1)(G) and Cal. Govt. Code § 12651(a)(7). The false records and Cost Report certifications were part of PAMC's unlawful scheme to defraud Medicare and Medi-Cal and avoid or decrease its obligation to repay funds it had received for which it was not entitled.

144. PAMC presented, or caused to be presented, all of said false claims and statements with actual knowledge of their falsity, or in deliberate ignorance or

reckless disregard that such claims were false.

145.   Further, PAMC, Ltd. and Pacific Alliance Medical Center, Inc. knowingly improperly avoided their long standing and continuing obligation to repay the wrongfully received and retained Medicare and Medi-Cal funds, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(7) and (a)(1)(G) and Cal. Govt. Code § 12651(a)(7).

146.   On information and belief, it is alleged that this conduct is continuing.

## XV.  **FIRST CAUSE OF ACTION**
(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1) and (a)(1)(A))
(Against PAMC, Ltd.)

147.   Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

148.   PAMC knowingly presented and caused the presentation of false and fraudulent claims for payment or approval to the United States (including causing false claims to be submitted by the State of California for the federal portion of Medi-Cal), and the payment of the false or fraudulent claims was a reasonable and foreseeable consequence of PAMC's statements and actions.

149.   Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

150.   These false claims were paid by the United States, resulting in damages in the millions of dollars.

## XVI.  **SECOND CAUSE OF ACTION**
(False Claims Act: Using False Statements to Get False Claims Paid)
(31 U.S.C. § 3729(a)(2) and (a)(1)(B))
(Against PAMC, Ltd.)

151.   Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

152.   PAMC knowingly made, used, and caused to be made or used, false records or statements — *i.e.,* the false certifications and representations made and

caused to be made by PAMC when initially submitting the false claims for payments and the false certifications made by PAMC in submitting its cost reports — to get false or fraudulent claims paid and approved by the United States.

153.   PAMC's false certifications and representations were made for the purpose of getting false or fraudulent claims paid, and the payment of the false or fraudulent claims was a reasonable and foreseeable consequence of PAMC's statements and actions.

154.   The false certifications and representations made PAMC were material to the United States' payment of the false claims.

155.   Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

156.   The false claims associated with these false statements were paid by the United States, resulting in damages in the millions of dollars.

## XVII.  THIRD CAUSE OF ACTION
(False Claims Act: Using False Record Material to an Obligation to Pay Money)
(31 U.S.C. § 3729(a)(7) and (a)(1)(G))
(Against PAMC, Ltd.)

157.   Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

158.   PAMC knowingly made and used false records or statements material to an obligation to pay or transmit money to the United States.

159.   Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## XVIII.  FOURTH CAUSE OF ACTION
(False Claims Act: Improperly Avoiding Obligation to Pay Money)
(31 U.S.C. § 3729(a)(7) and (a)(1)(G))
(Against PAMC, Ltd. and Pacific Alliance Medical Center, Inc.)

160.   Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

161.   PAMC, Ltd. and Pacific Alliance Medical Center, Inc. knowingly improperly avoided their long standing and continuing obligation to repay the wrongfully received and retained Medicare funds to the United States, in violation of  the False Claims Act, 31 U.S.C. § 3729(a)(7) and (a)(1)(G).

### XIX.  FIFTH CAUSE OF ACTION
(California False Claims Act: Presentation of False Claims)
(Cal. Govt. Code § 12651(a)(1))
(Against PAMC, Ltd.)

162.   Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

163.   PAMC knowingly presented false and fraudulent claims for payment or approval to the State of California, and the payment of the false or fraudulent claims was a reasonable and foreseeable consequence of PAMC's statements and actions.

164.   Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

165.   These false claims were paid by the State of California, resulting in damages in the millions of dollars.

### XX.  SIXTH CAUSE OF ACTION
(California False Claims Act: Using False Statements to Get False Claims Paid)
(Cal. Govt. Code § 12651(a)(2))
(Against PAMC, Ltd.)

166.   Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

167.   PAMC knowingly made, used, and caused to be made or used, false records or statements — *i.e.,* the false certifications and representations made by PAMC when initially submitting the false claims for payments and the false certifications made by PAMC in submitting its cost reports — to get false or fraudulent claims paid and approved by the State of California.

168.   PAMC's false certifications and representations were made for the purpose of getting false or fraudulent claims paid, and payment of the false or

fraudulent claims was a reasonable and foreseeable consequence of the PAMC's statements and actions.

169.   The false certifications and representations made by PAMC were material to the State of California's payment of the false claims.

170.   Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## XXI.  SEVENTH CAUSE OF ACTION
(California False Claims Act: False Record Material to Obligation to Pay Money)
(Cal. Govt. Code § 12651(a)(7))
(Against PAMC, Ltd.)

171.   Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

172.   PAMC knowingly made and used false records or statements material to an obligation to pay or transmit money to the State of California.

173.   Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## XXII.  EIGHTH CAUSE OF ACTION
(California False Claims Act: Improperly Avoiding Obligation to Pay Money)
(Cal. Govt. Code § 12651(a)(7))
(Against PAMC, Ltd.)

174.   Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

175.   PAMC, Ltd. and Pacific Alliance Medical Center, Inc. knowingly improperly avoided their long standing and continuing obligation to repay the wrongfully received and retained Medi-Cal funds to the State of California, in violation of  the California False Claims Act, Cal. Govt. Code § 12651(a)(7).

///

///

## XXIII.  NINTH CAUSE OF ACTION
(Joint and Several Liability of General Partner)
(Cal. Corp. Code §§ 15904.04, 05)
(Against Pacific Alliance Medical Center, Inc.)

176.   Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

177.   As the general partner of PAMC, Ltd., Pacific Alliance Medical Center, Inc. is jointly and severally liable for all obligations of PAMC, Ltd. California Limited Partnership Act of 2008, Cal. Corp. Code §§ 15904.04 (a) ("all general partners are liable jointly and severally for all obligations of the limited partnership unless otherwise agreed by the claimant or provided by law").  To the extent a monetary judgment is entered against PAMC, Ltd., that monetary judgment is an obligation of PAMC, Ltd. and a judgment should be entered against Pacific Alliance Medical Center, Inc. for joint and several liability for that obligation.  Cal. Corp. Code §§ 15904.05(a) ("To the extent not inconsistent with Section 15904.04, a general partner may be joined in an action against the limited partnership or named in a separate action.").

## XXIV.  ADDITIONAL  RECORDS

178.   Relator cannot at this time identify all of the false claims for payment that resulted from PAMC's conduct.  The false or fraudulent claims were presented by thousands of separate transactions.  Relator has no control over or dealings with PAMC's billings and has no access to the records in PAMC's possession.

## XXV.  PRAYER FOR RELIEF

WHEREFORE, *qui tam* plaintiff prays for relief as follows:

1.   For three times the dollar amount shown to have been wrongfully charged to and paid by the United States and by the State of California;

2.   For maximum civil penalties for all false records, statements, certifications and claims submitted to the United States and the State of California, subject to being consistent with the Excessive Fines and Penalties Clause of the Eighth Amendment to United States Constitution;

3.      For the maximum statutory *qui tam* share of the recovery obtained for the United States and the State of California;

4.      For all other damages allowed under law, including litigation expenses and reasonable attorneys' fees; and

5.      For such other and further relief as the court deems just and proper.


Dated:   September 26, 2016         Respectfully submitted,

Warren ■ Benson Law Group


/s/ Donald R. Warren
Donald R. Warren
Attorney for *Qui Tam* Plaintiff Paul Chan

**CERTIFICATE OF SERVICE**

I certify that on the date stated above I electronically filed this document with the Clerk of the Court using CM/ECF to be served on all counsel of record who are registered CM/ECF users.

I further certify that I have caused this document to be mailed by First-Class Mail, postage prepaid to the following non-CM/ECF participant:

Nicholas N. Paul
Supervising Deputy Attorney General
1300 I Street, Suite 1740
Sacramento, CA 95814

/s/ Donald R. Warren
Donald R. Warren